No. 81,519

STATE OF KANSAS, *Appellee,* v. BYRON RAYTON, *Appellant.*

(1 P.3d 854)

Opinion filed March 10, 2000.

*Pamela A. McLemore*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the briefs for appellant.

*John W. Withee*, assistant district attorney, argued the cause, and *Joan Hamilton*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: The defendant appeals his convictions of felony murder and criminal discharge of a firearm at an occupied dwelling, claiming the judge improperly (1) communicated ex parte with two jurors; (2) refused to grant a mistrial; and (3) failed to instruct on lessor included offenses. He also contends that his felony murder conviction merged with the crime of criminal discharge of a firearm and that imposition of consecutive sentences for felony murder and criminal discharge violates double jeopardy.

On March 7, 1997, Larry Bryant, a resident at the Turner House Apartments in Topeka, Kansas, died due to three gunshot wounds. Topeka police officers recovered 15 casings at the crime scene. Spent bullets were found in one apartment, and a cleaning rod from either an SKS or AK-47 rifle was found along the outside wall of the apartment complex.

Byron Rayton was charged with one count of first-degree premeditated murder and, in the alternative, felony murder, four counts of criminal discharge of a firearm at an occupied building, and two counts of criminal discharge of a firearm at an unoccupied building. The criminal discharge of a firearm at an occupied building counts alleged four different victims.

At trial, Sergeant John Anguiano of the Topeka Police Department testified that he was working at a neighboring business as a private security guard at the time of the shooting. He heard be-

tween 10 and 15 gunshots fired in rapid succession. After the gun-fire ceased, Anguiano observed a dark-colored vehicle driving from the parking lot of the Turner House Apartments and two other vehicles, a dark-colored vehicle and a white vehicle, driving south down the alley behind the apartment complex.

The manager of the Turner House Apartments, Denise Abbott, testified that she was familiar with the tenants and regular visitors to the complex. Abbott stated that on the evening of the shooting, she observed a car drive into the north driveway of the apartment complex. She did not recognize the two people in the front seat of the car, and she was unable to see into the back seat. She observed a man exit the car and walk west on the north side of the building. The car followed the man. Abbott described the man as a black male, approximately 5'6" to 5'7", with a small build and short hair. Soon after the man was out of her sight, Abbott heard gunshots.

Asuncion Gonzalez and her two children shared an apartment with Layla Jabary and Jabary's children at the Turner House Apartments. Gonzalez testified that about 8 p.m. on the evening of the shooting, she and Jabary decided to take the children to dinner. As the women placed the children in the car, they heard rapid gun-shots. Gonzalez threw her children to the floor of the car, then she ducked into the seat. When the gunfire ceased, Gonzalez looked up and saw a medium built black man with a hooded sweatshirt and jeans or sweatpants running along the upper story of the apartment building, carrying a long gun. The muzzle of the gun was pointed towards the ground. Gonzalez thought she recognized the man, but she was unable to recall the man's name. The man jumped from the back stairwell of the building, then ran to a car waiting in the alley and entered the passenger door of the car. When the car door opened, Gonzales observed the driver was a white woman with blonde hair.

Layla Jabary testified that after hearing gun shots, she saw a man dressed in black carrying a gun. She watched him get into a nearby car. Jabary stated that she got a good look at the man as he passed directly in front of her car. She recognized Byron Rayton, an in-dividual with whom she had gone to high school.

Jennifer Pleasant, a visitor at the Turner House Apartments on the evening of the shooting, testified that she had gone to the apartments to visit her friends, Marie Gonzales and Lori Jabary. While at the apartments, she noticed a car driven by a blonde woman circle the building several times. She heard gunshots and recognized the defendant, Byron Rayton, walking around the building carrying a long gun. She had attended high school with Rayton. After the shooting, Pleasant watched Rayton get into the car driven by the blonde woman.

Katie Welch testified that on the evening of the shooting she drove Rayton and his brother, Jermaine, to the Turner House Apartments. Jermaine was in the back seat of the car. Welch stated that when they arrived at the apartments, Rayton got out of her car. She then drove to the rear of the building. After approximately 15 minutes, she heard gunfire. When Rayton returned to her car, he was carrying a black gun. He got into the car and told her to drive to a friend's house. Welch testified that later that day at Rayton's grandmother's house, she saw either Rayton or his brother, Jermaine, place the black gun in a vehicle.

Police officers testified that as part of the investigation into the shooting, a search warrant was executed at Welch's residence. Two rifle magazines, a gun clip, a Weaver scope, a mounting bracket, a rifle sling, and an ammunition pouch were seized from Welch's apartment.

Jermaine Rayton, the defendant's brother, a witness for the defense, testified that he had previously been tried and acquitted of the premeditated murder of Larry Bryant and of discharging a firearm at an occupied and at an unoccupied building. Jermaine was aware he could not be retried for the crime. Jermaine Rayton is 8 years younger, 4 or 5 inches taller, and 70 pounds heavier than his brother, Byron Rayton. Jermaine testified that he was 14 years old on the day of the shooting and that it was he, not his brother, who fired a gun at the Turner House Apartments.

Byron Rayton was convicted of first-degree felony murder and one count of criminal discharge of a firearm at an occupied dwelling. Rayton appealed his convictions, raising multiple issues.

## EX PARTE COMMUNICATIONS WITH JURORS

During the trial, the trial judge disclosed to the parties that one of the jurors had reported to him that she and other jurors were concerned about the presence of two "young black males" in and about the courthouse who had been staring at the jurors. A juror informed the judge that she felt intimidated by the men. The judge, in response to the juror's concerns, invited the complaining juror and one other juror into his chambers to discuss the problem. Both jurors stated their concerns.

After the judge recounted his communications with the jurors to the parties, the prosecutor requested that the judge assign a deputy sheriff to monitor the courthouse hallway. The defense attorney joined in that request. The defense attorney was concerned that the jurors might assume an association between the defendant and the two men. Because one of the men involved in the alleged intimidation was Jermaine Rayton, the defendant's younger brother and the sole defense witness, the defense attorney, rather than requesting a mistrial, suggested that the judge conduct a second inquiry of the jurors to record their comments and concerns. The defense counsel requested the judge to ask the jurors if their ability to decide the case based on the evidence had been compromised by the perceived attempts at intimidation. The State agreed. The judge then inquired of Byron Rayton if he waived his right to be present during the ex parte inquiry of the jurors. Rayton waived his right to be present.

The court reporter was present when the judge in his chambers inquired into the two jurors' complaints and concerns. The jurors told the judge that two young black men had been loitering in the courthouse halls, "staring" at the jurors as they entered and exited the courtroom. The judge noted that one of the men described by the jurors resembled the defendant's brother who was also a defense witness. Then, for some unknown reason, the judge disregarded his agreement with defendant's trial counsel and asked the court reporter to go off the record. When the judge came back on the record, he stated:

"Well, what I am going to do is we will get the lawyers back in here and I will tell them the conversation; I have also told them if they want the court reporter

to read it back I will have her do it and they can hear what you said. That's their choice. But I think pretty much that's pretty much the end of it; and I have told my administrative assistant to periodically check out there and, if these people are still hanging around, we are going to, you know, ask them to leave or get a place where they won't be, you know, in your pathway.

"The important part, though, is if this individual does turn out to be a witness that you can be fair and judge his testimony like you would anybody else."

The jurors assured the judge that their ability to decide the case based on the evidence had not been compromised. The judge then assembled the defendant and the attorneys for the State and the defense and related his conversation with the jurors:

"And I am simply told that it was—it was simply the presence of these people and they—Ms. Lowhorn said that one of them is out in the hall this morning, and she described Jermaine Rayton; but she also says that it simply doesn't rise to any sort of a problem whatsoever as far as she is concerned, and she will judge this witness' testimony in the same manner she would judge anybody else's testimony. He said nothing to her; and she just—she just—She feels that she may even have gotten the wrong impression, you know, about the whole thing, and so forth."

The defense counsel moved for a mistrial, stating, "I especially make that application because the lady described Jermaine Rayton and he is going to be our witness." The judge then instructed the court reporter to read the transcript of the hearing with the jurors. After hearing the court reporter's readback, defense counsel renewed his motion for a mistrial:

"Your Honor, if the Court please, on behalf of Mr. Rayton I am going to renew my motion for a mistrial. Let me tell you what the problem is: It is my view that regardless of what these jurors are saying, if you listen to how they answered Your Honor's questions—and you did a very good job of trying to put them at ease—they are terrified, at least one of them is terrified, and especially since Jermaine Rayton is going to testify; we have real problems. And I think it's going to cause Mr. Rayton—my Mr. Rayton, my client Mr. Rayton to receive less than a fair trial. I am really bothered. I wish we would have had some alternates, it is no one's fault we don't have that. If we had alternate jurors I would ask, and I think everybody would put 'em in the box right away and remove at least one of these jurors; we got problems. He is not going to receive a fair trial; they are not going to listen to what Mr. Rayton has to say, Jermaine Rayton, they find him intimidating, they find him to be a hulking presence, is the way I'm interpreting it."

The judge denied the defense motion for a mistrial, stating that in his opinion the jurors would be able to decide the case based

on the evidence. Regarding the off-the-record portion of the hearing, the judge stated,

"[T]he conversation off the record concerned general courthouse security and [the jurors] wondered why people weren't patrolling the halls and so forth; and I explained to them some of the reasons why and all that sort of thing. Not even dealing with . . . this incident, they just expected to see people patrolling the halls."

Defense counsel did not object to the revelation of the judge's off-record discussion to resolve the jurors' concerns.

K.S.A. 1999 Supp. 22-3405, as well as the Sixth Amendment Confrontation Clause and the Fourteenth Amendment Due Process Clause, requires the defendant's presence at every critical stage of a trial, including a conference between a trial judge and a juror. *Crease v. State*, 252 Kan. 326, 333, 845 P.2d 27 (1993); *State v. Lovely*, 237 Kan. 838, 843-44, 703 P.2d 828 (1985). Further, K.S.A. 22-3420(3) requires that once the jury has begun deliberations, any questions from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence, unless the defendant is absent voluntarily. *Crease*, 252 Kan. at 333.

The denial of a defendant's constitutional right to be present at all critical stages of the trial is subject to a constitutional analysis to determine if the error was harmless. Before an error of constitutional magnitude may be declared harmless, the appellate court must be able to decide beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. McGinnes*, 266 Kan. 121, Syl. ¶ 3, 967 P.2d 763 (1998).

Kansas has adopted a four-factor test for analyzing the effect of ex parte communications with the jury: (1) the overall strength of the prosecution's case; (2) whether an objection was lodged; (3) whether the ex parte communication concerned a critical aspect of the trial or rather involved an innocuous and insignificant matter and the manner in which it was conveyed to the jury; and (4) the ability of a post-trial remedy to mitigate the constitutional error. 266 Kan. 121, Syl. ¶ 4.

### *Strength of the Prosecution's Case*

Regarding the first factor, Rayton asserts that as in *McGinnes*,

the strength of the prosecution's case against him was evenly balanced by the strength of his defense.

In *McGinnes,* the State's case was based on the credibility of the complaining witness, an 8-year-old girl who disclosed sexual abuse 9 months after the fact and after her mother questioned her at the insistence of a former friend of the defendant. During jury deliberations, the judge, who happened to be standing outside the jury room, overheard jurors questioning the absence of testimony by the police chief who had taken the girl's statement. The judge, in an unrecorded communication, told the jury it should not concern itself with the police chief's absence because the chief was attending the law enforcement academy and was unable to be present at trial.

Following a readback of evidence requested by the jury during its deliberations, the judge, without consulting either counsel, instructed the jury *sua sponte* regarding its duty to consider only the evidence produced at trial and not to divert or speculate on things that have not been presented as evidence. On appeal, the *McGinnes* court noted that the judge's *sua sponte* instruction included the information provided to the jury in the previous ex parte communication and compounded the damage caused by the communication. The *McGinnes* court reviewed the record and found that the evidence was not overwhelming; in fact, it was balanced, and reversed the defendant's conviction because it was unable to declare beyond a reasonable doubt that an ex parte communication and an erroneous instruction had little, if any, likelihood of having changed the result of the trial. 266 Kan. at 138-39.

Here, one of the State's primary witnesses, Katie Welch, the woman who drove Rayton to the Turner House Apartments on the evening of the shooting, had a significant credibility problem. Welch had told the police numerous conflicting stories and had admitted to lying to the police on several occasions regarding this matter. She had told the police at one time that she did not see the defendant with a weapon. She told the police at another point that she was not even present when the shooting occurred. Her testimony implicating the defendant in the shooting came after she made a plea agreement reducing a charge pending against her from

first-degree murder to aiding a felon. She admitted that she testified to avoid a first-degree murder charge and that she would not have testified but for the plea agreement. Finally, Welch stated that she was so high and drunk on the night of the shooting that she really did not know what had happened.

Balanced against Welch's suspect testimony was that of the sole defense witness, Jermaine Rayton. Jermaine's admission, after having been already acquitted of the crime, likely carried very little weight with the jury.

In addition, the State's other witnesses who had no identified biases testified that a man with Rayton's physical description carrying a gun got into a car moments after the shooting. Jabary and Pleasant both positively identified Rayton, a former high school acquaintance, as the man they saw with a gun. The evidence was overwhelming in favor of the State.

### Objection to the Ex Parte Communications

The defense counsel, based on the information the judge received from the juror, moved for a mistrial after the third and final ex parte communication. In *McGinnes*, this court observed that an objection serves little purpose where the ex parte communication has already taken place. Therefore, the objection or lack of a specific objection may not be dispositive of the outcome of the issue.

### Matters Discussed in the Ex Parte Communication and Manner of Communication

The matters communicated in the ex parte communication did not concern evidence. The subject of the communication was significant, however, because, as Rayton asserts, it involved possible juror prejudice and the ability of jurors to objectively evaluate the evidence after feeling threatened by the presence of defendant's sole witness. This factor goes to the substance of the communication and more appropriately bears on whether the trial court abused its discretion in failing to grant Rayton's motion for a mistrial predicated on juror prejudice.

The manner of the judge's contact with the jury is troubling. While a juror initiated the first communication with the judge, the

judge improperly initiated the second contact to discover the specific concerns of the jurors. The judge did not inform the parties of the problem prior to inviting the jurors into his chambers. Although the third on-the-record communication was authorized by the parties, it included an unauthorized communication when, for an unknown reason, the judge went off the record. When the judge came back on the record, he failed to fully review the context of the communication with the two jurors that had occurred while off the record. Although the judge later summarized the context of the off-record communication to the attorneys and the defendant, that summary was out of the presence of the jurors so there was no verification or affirmance by the jurors of the judge's perception of the matters communicated.

The defendant moved for a mistrial when the content of the off-record communications was disclosed. The judge refused to grant a mistrial. Therefore, a post-trial remedy was sought and denied.

### Effect of Ex Parte Communications

Clearly, the court erred in conducting ex parte communications with jurors. Ultimately, our decision regarding whether an ex parte communication is reversible error revolves around whether we are able to decide beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. See *McGinness*, 266 Kan. at 132-33.

The State's case contained overwhelming evidence that the defendant was observed by individuals who knew him carrying a gun and fleeing from the scene of the shooting. Under the circumstances there is little, if any, likelihood that the fact that the judge conducted ex parte communications with jurors changed the result of the trial.

## MOTION FOR MISTRIAL

A mistrial occurs if there is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law and the defendant requests or consents to the declaration of a mistrial. A mistrial should be granted when prejudicial conduct, in or outside the courtroom, makes it impossible

to proceed with the trial without injustice to either the defendant or the prosecution. K.S.A. 22-3423(1)(b) and (c).

Rayton asserts that the third ex parte communication between the judge and the jurors reveals that at least one juror harbored subtle racial prejudices which compromised her ability to objectively consider his guilt. It is within the trial court's discretion to declare a mistrial when it is shown that a juror becomes so prejudiced during the trial that he or she cannot serve as a fair and impartial juror. *State v. Zamora*, 263 Kan. 340, 349, 949 P.2d 621 (1997). Rayton contends that the juror's prejudice denied him a fair trial; therefore, the trial court abused its discretion in failing to grant a mistrial.

To support his contention that the jurors' reaction to the presence of the two men outside the courtroom was based on racial prejudice, Rayton points to the fact that the jurors identified no overt act by the men to explain their feelings of threat and intimidation—it was mere presence of young black men that provoked an unreasonable response in the minds of the jurors. Rayton also asserts that the timing of the off-the-record portion of the ex parte communication with the jurors suggests a discussion regarding the race of the young men.

The State disputes Rayton's conclusion that the jurors' concerns reflected racial prejudice and the jurors' perception of a threat from the sole defense witness established bias and was grounds for a mistrial. The State questions Rayton's basis for his allegation of racial prejudice because the race of the jurors is not evident in the record.

Just prior to the judge's order to continue the communication off the record, the judge had asked the jurors if both of the persons they were concerned about were "black males." One of the jurors stated that the men were black and that they were both young. The judge then made the order to continue off the record. When the record resumed, the judge stated that the jurors had just told him that the jurors were troubled by the fact that the men had been standing around the elevators and that the jurors had to pass the men on their way to the jury room.

There is no explanation by the judge as to why he continued the conversation off the record, and the off-the-record portion of the communication was not authorized by the defendant's waiver. The omission leaves room for speculation and, in light of the recorded conversation just prior to the off-the-record discussion, it is not unreasonable to assert that fears based on racial prejudices were discussed.

It must be noted that the jurors were attempting to identify the men to the judge. They stated the two men were young. It was the judge who asked if the two young men were "black males." Other than the use of the designation "black" by the judge to describe the men, there is nothing in the jurors' complaint to suggest racial prejudice during the recorded portion of the judge's communication with the two jurors. Furthermore, Rayton is incorrect in his assertion that the jurors were unable to identify any overt act by the men which prompted their feelings of intimidation. The jurors were specific in stating that the threat and intimidation was the result of being stared at by the young men.

More troubling, however, is the fact that, whether reasonably or unreasonably, the jurors felt threatened by a defense witness whose credibility was central to the defendant's case. The State argues that the defendant should not be rewarded with a new trial because his brother was successful at intimidating jurors. Rayton urges this court to determine that misconduct on the part of a third party does not deprive a defendant of the right to a panel of fair and impartial jurors.

A review of the record indicates the jurors assured the judge that they were able to objectively consider the evidence and render a verdict unbiased by the perceived threats. The judge had an opportunity to observe the demeanor of the jurors. When the judge denied Rayton's motion for a mistrial, he stated:

"Well, I guess the decision I make is based, at least in part, on my assessment of [the jurors'] demeanor in talking to them and . . . the way they responded to my questions and the—the forthrightness with which they answered and their—their overall attitude, which was a low level of concern about the entire incident or series of incidents, and that it wasn't something that would affect a decision, and they were very convincing about that. And maybe from the print, you know,

on the paper in the record, that doesn't come off that way but that's the way I assess it. And I am very interested in Mr. Rayton having a fair trial and I thought—"

In view of the judge's assessment of the lack of actual intimidation felt by the jurors, the judge did not abuse his discretion in denying Rayton's motion for a mistrial.

## LESSER INCLUDED OFFENSES

At trial, Rayton requested that the court instruct the jury on the lesser included offenses of first-degree murder, *i.e.*, second-degree murder, voluntary manslaughter, and involuntary manslaughter. The trial court refused to instruct on the lesser included offenses.

When a murder is committed during the commission of a felony, the rule requiring the giving of instructions on lesser included offenses does not apply. We recognize an exception to the rule when there is extremely weak or conflicting evidence that the underlying felony was committed and where the evidence supports a conviction of the lesser crime. *State v. Murdock*, 236 Kan. 146, 155, 689 P.2d 814 (1984). If the evidence of the underlying felony is weak, inconclusive, or conflicting an instruction on lesser included offenses may be required. *State v. Strauch*, 239 Kan. 203, 218, 718 P.2d 613 (1986).

Rayton contends that the trial court's failure to instruct on the lesser offenses was error because there was conflicting evidence as to whether he or his brother fired the gunshots into the occupied dwellings. Rayton misconstrues the rule. The rule pertains to evidence that the underlying felony was committed. In this case, there is no doubt that an underlying felony was committed. Therefore, if the jury believed that Rayton committed the underlying felony, Rayton was guilty of felony murder. Under the facts of this case, the trial judge did not err in refusing to instruct on lesser included offenses.

## MERGER OF CRIMES

Rayton contends that he was improperly convicted of felony murder and the underlying felony of criminal discharge of a firearm at an occupied dwelling. He argues that the underlying crime merges into the crime of felony murder. The State responds that

the legislature specifically provided for separate convictions of felony murder and criminal discharge of a firearm in K.S.A. 21-3401(b) (providing that a killing during the commission of an inherently dangerous felony is felony murder) and K.S.A. 21-3436(a)(15) (defining criminal discharge of a firearm at an occupied building as an inherently dangerous felony). This court has held on numerous occasions that the crimes of felony murder and criminal discharge of a firearm do not merge. See *State v. Sims,* 265 Kan. 166, 176-77, 960 P.2d 1271 (1998); *State v. Sims,* 262 Kan. 165, 171-72, 936 P.2d 779 (1997); *State v. Alderson,* 260 Kan. 445, 459, 922 P.2d 435 (1996).

In Rayton's reply brief, he changes his argument and contends that the statute authorizing criminal discharge of a firearm as an underlying felony of felony murder is unconstitutional. Rayton does not identify the constitutional violation. However, the question of merger generally arises in the context of a double jeopardy claim. A violation of the prohibition against double jeopardy is a question of law, and this court's review is de novo. *State v. Holt,* 260 Kan. 33, 44, 917 P.2d 1332 (1996).

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall be subject to be twice put in jeopardy of life or limb for the same offense. The Clause is enforceable against the states through the Fourteenth Amendment. Equivalent double jeopardy protection is found in Section 10 of the Kansas Constitution Bill of Rights. The Double Jeopardy Clause shields persons from a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. 260 Kan. at 44-45.

The proper test for determining whether an underlying felony merges into a homicide is whether all the elements of the felony are present in the homicide and whether the felony is a lesser included offense of the homicide. If this is not true, then the felony must be a separate and distinct offense and the doctrine of merger does not apply. A more correct formulation of the proper test when considering merger is whether the elements of the underlying fel-

ony are so distinct from the homicide so as not to be an ingredient of the homicide. 260 Kan. at 45.

Criminal discharge of a firearm at an occupied dwelling requires proof that the defendant discharged a firearm at an occupied dwelling. K.S.A. 1999 Supp. 21-4219. Felony murder requires proof that a person was killed during the commission of an inherently dangerous felony. K.S.A. 21-3401(b). Clearly, the two offenses are separate and distinct offenses requiring proof of different elements.

The jury found that Rayton sprayed an apartment building with gunfire. No evidence was introduced at trial that he intended any harm specifically to Larry Bryant. However, during commission of the felony, Bryant was killed. Therefore, the murder of Bryant was perpetrated during the commission of a dangerous felony. The crimes do not merge.

## DOUBLE JEOPARDY

Rayton contends that consecutive sentences for felony murder and criminal discharge of a firearm violate double jeopardy. The constitutional prohibition against double jeopardy and our standard of review has been previously stated in this opinion.

It is well-established law in Kansas that multiple convictions and punishments for both felony murder and the underlying felony do not violate double jeopardy. *Sims*, 262 Kan. at 173. Consecutive sentences for felony murder and criminal discharge of a firearm do not violate double jeopardy. 262 Kan. at 173.

Affirmed.