IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 116,174

STATE OF KANSAS,
*Appellee*,

v.

DUSTIN D. WALKER,
*Appellant*.

SYLLABUS BY THE COURT

1.

In most circumstances, a judge should allow the attorneys and a criminal defendant to be present when communicating in person with a juror.

2.

In the context of an issue about a defendant's right to be present during critical stages of a trial, appellate courts examine harmlessness by focusing on four factors: (1) the strength of the State's case; (2) the existence of an objection from the defendant; (3) the nature of the proceeding from which the judge excluded the defendant and whether the communication concerned a critical or insignificant matter; and (4) the ability of posttrial remedies to mitigate the error.

3.

If a prior trial in the same case resulted in a hung jury, an appellate court conducting a harmless error review should view the lack of a verdict in a prior trial as a factor weighing on the assessment of the strength of the evidence, not as determinative.

1

**4.**

The party alleging judicial misconduct bears the burden of showing prejudice.

**5.**

Judicial misconduct warrants a new trial when it affirmatively appears the misconduct prejudiced the substantial rights of the complaining party. The mere possibility of prejudice does not warrant overturning a verdict or judgment. Judicial misconduct prejudices a defendant's substantial rights and warrants a new trial when it: (1) makes the judge appear less than impartial or (2) pollutes the entire trial.

**6.**

A judge's misconduct pollutes the entire trial when the misconduct consists of more than an isolated comment or action and the judge fails to purge the taint of the misconduct.

**7.**

In determining the voluntariness of a waiver of *Miranda* rights, appellate courts review a district judge's factual findings for substantial competent evidence and its ultimate legal conclusions de novo. Appellate courts do not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence.

**8.**

A defendant's waiver of his or her *Miranda* rights must be knowing, voluntary, and intelligent under the totality of the circumstances. Factors courts consider in determining the voluntariness of a defendant's statement include: (1) the defendant's mental condition; (2) the duration and manner of the interrogation; (3) the defendant's ability to communicate with the outside world on request; (4) the defendant's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation;

and (6) the defendant's fluency with the English language. Any one factor or a combination of factors may show that the defendant's statement was involuntary under the totality of the circumstances.

9.

Appellate courts use a two-step analysis when considering a claim that a district judge erred in his or her response to a jury question. First, the appellate court conducts a de novo review to determine if the district judge either failed to respond or provided an erroneous response to the jury's question. Second, if the district judge responds to the jury's request, the appellate court reviews the sufficiency or propriety of the response for abuse of discretion. A district judge's response constitutes an abuse of discretion when no reasonable person would have given the response, the response includes an error of law, or the response includes a factual error.

10.

Appellate courts review claims of cumulative error by examining all errors collectively to determine whether the combined errors, under the totality of the circumstances, warrant reversing a conviction. In making this assessment, appellate courts examine the errors in the context of the record as a whole, considering how the district judge dealt with the errors as they arose, including the efficacy, or lack of efficacy, of any remedial efforts; the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence.

Appeal from Douglas District Court; PAULA B. MARTIN, judge. Opinion filed June 29, 2018. Affirmed.

*Peter Maharry*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Kate Duncan Butler*, assistant district attorney, argued the cause, and *Charles E. Branson*, district attorney, and *Derek Schmidt,* attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: The State charged Dustin Walker with aggravated burglary and first-degree felony murder. A jury convicted Walker of aggravated burglary, but it could not reach a verdict on the felony-murder charge. After a second trial, the jury hung, but a third jury convicted Walker of felony murder.

On appeal, Walker asserts five claims of error. He argues: (1) The district judge committed reversible error during the third trial by communicating with two jurors without Walker being present; (2) the district judge committed reversible misconduct during the third trial by shredding notes found in the jury room without first showing the notes to Walker and his attorney; (3) the district judge erred during the third trial by not suppressing Walker's interview with law enforcement officers; (4) the district judge erred in the first trial by not responding appropriately to a jury question about Walker's criminal liability arising from evidence against another participant in the crime; and (5) cumulative error requires reversal of Walker's convictions. The first three claims affect only the felony-murder conviction and the fourth affects only the aggravated burglary conviction. We reject his arguments and affirm both convictions.

FACTS AND PROCEDURAL HISTORY

In the early morning hours of March 8, 2014, Michael Roberts awoke to banging on the front door of the apartment where he lived with his grandmother, Marilyn Howard; his father, Patrick Roberts; and his uncle, Wayne Roberts. Michael thought someone was kicking the door. As Michael got up, the front door swung open and two men entered the apartment—one in black clothing and one in light gray clothing. The man in the black

4

clothing pointed a gun at Michael; Michael later identified Walker as this man. Video surveillance footage from a nearby convenience store showed Walker with his cousin, Archie Robinson, at the store just before they broke into the apartment. In the video, Robinson wore light gray clothing.

According to Michael's testimony, Walker and Robinson walked toward Patrick's bedroom, where Patrick sold marijuana. Robinson entered Patrick's bedroom while Walker stood in the bedroom doorway. Either Robinson or Walker asked, "Where is it? Where is it?" Patrick responded, "I don't know what you're talking about." Walker stepped into Patrick's bedroom, the gun fired once, and Patrick yelled for Wayne. Wayne came out of his bedroom and a struggle ensued.

Michael and Wayne, for the most part, provided identical testimony about the struggle. During the first two trials, Michael and Wayne both testified that Wayne and Walker struggled for the gun as Robinson and Michael watched from the living room. At the third trial, however, Wayne's testimony at first pointed to Robinson as the gunman. But Wayne switched his testimony and once again matched Michael's testimony by pointing to Walker as the gunman and Robinson as the bystander.

Michael and Wayne testified consistently about all other aspects of the struggle. Both testified that at some point during the struggle the gun fired a second time toward the kitchen. A few seconds later, Patrick, bleeding from a gunshot wound, exited his bedroom and joined the struggle. Wayne eventually knocked the gun out of Walker's hands. Walker and Robinson fled out the front door. Marilyn, awakened by the commotion, called 911. Patrick died shortly thereafter.

Officers arrived within minutes and began a search of the area. They apprehended Walker and Robinson, at which time Walker was wearing dark clothing and Robinson

was wearing light clothing but no shoes. Both had a large amount of Patrick's blood on their clothing.

Officers collected evidence from the apartment including a gun, hat, shoe, and shoe print on the front door. Investigators later confirmed the gun fired the bullet that killed Patrick. Officers discovered the gun belonged to Walker's girlfriend, the hat contained Walker's DNA, the shoe matched shoes worn by Robinson that night, and the shoe print on the door had similar design features to the shoes worn by Robinson.

Officers also interviewed Walker. During the interview, Walker said he was staying at Patrick's apartment on the night in question. He explained a struggle awakened him. He joined the struggle and eventually fled. Walker could not recall who he struggled with or whether he touched the gun.

The State charged Walker with aggravated burglary, K.S.A. 2013 Supp. 21-5807(b), and felony murder, K.S.A. 2013 Supp. 21-5402(a)(2). The first trial resulted in a conviction for aggravated burglary, but the jury could not reach a verdict on the felony-murder charge. Walker testified at the first trial, explaining he and Robinson were buying marijuana from Roberts when someone rushed and tackled Robinson. As Robinson and the other individual struggled, the gun went off. Walker told the jury he did not have a gun and did not know that Robinson did. Walker then tried to help Robinson, and a second shot went off. Roberts came out of his bedroom and fell on top of all of them. Robinson and Walker eventually freed themselves and ran out the door.

The record on appeal contains little information about the second trial, but we know the jury could not reach a verdict. The third jury convicted Walker of first-degree felony murder. Walker did not testify at the third trial.

6

In discussing Walker's arguments, we will add additional facts.

ISSUE 1: *Did the district judge violate Walker's right to be present at all critical stages of his trial when the judge communicated with jurors during the third trial?*

Walker's first issue arises from communications between the district judge and jurors during Walker's third trial. The communications arose after the jury had started deliberations and a juror found a notepad from the second trial in the jury room. The juror opened the notepad, closed it when he saw Walker's name on the first page, and handed it to a second juror. The second juror opened the notepad and closed it when he saw Walker's name on the first page. One of the two jurors then delivered the notepad to the bailiff. The bailiff gave the notepad to the judge, and the judge met privately with the juror who had delivered the notepad.

As the jury deliberated, the judge met with Walker, his attorney, and the prosecutor. The judge explained the situation with the notepad and her conversation with the one juror. The judge also explained that she had opened the notepad and found it contained a list of witnesses from the second trial and the general subject matter of each witness' testimony. For example, it said, "DNA witness" or "[s]hoe print witness." The judge determined there was "nothing there that was a problem," and shredded the notes. The judge explained she had asked if the juror had read through the notepad and the juror said, "'I saw it said Dustin Walker at the top and I thought I should shut this.'" The judge admitted she probably should not have shredded the notes before showing them to the attorneys, and asked if either party wanted to question the jurors about the notes. Both parties declined at that point.

Following the jury's verdict, however, the judge, attorneys, and the two jurors who had opened the notepad met in chambers. Walker was not present (or at least the record does not suggest his presence so we assume his absence). Both jurors reiterated they

7

opened the notepad, closed it upon reading Walker's name, and gave it to the bailiff. The judge again asked if either party wanted to question the jurors and both parties declined.

Now, on appeal, Walker claims the district judge violated his right to be present during a critical stage of his trial when the judge first met with the juror who delivered the notebook and when the judge and the attorneys met with both jurors. His arguments raise a question of law over which we exercise unlimited review. *State v. Herbel*, 296 Kan. 1101, 1106-07, 299 P.3d 292 (2013).

Here, the State concedes the district judge violated Walker's statutory and constitutional rights. This stipulation finds strong support, and we also conclude error occurred. In most circumstances, a judge should allow the attorneys and a criminal defendant to be present when communicating in person with a juror. See *State v. Rayton*, 268 Kan. 711, 720, 1 P.3d 854 (2000); see also K.S.A. 2017 Supp. 22-3405(a) ("The defendant in a felony case shall be present at . . . every stage of the trial . . . except as otherwise provided by law."); *State v. Killings*, 301 Kan. 214, 241, 340 P.3d 1186 (2015) (holding a defendant's right to be present extends to conferences between judge and juror); *State v. Lopez*, 271 Kan. 119, 129, 22 P.3d 1040 (2001) ("The Sixth Amendment's Confrontation Clause and the Due Process Clause of the Fourteenth Amendment require a defendant's presence at every critical stage of a trial.").

While the parties agree that error occurred, they disagree about whether that error requires reversal or whether we may consider it harmless. They agree, however, that in resolving that dispute we should apply the federal constitutional harmless error standard. We agree. See *State v. King*, 297 Kan. 955, 968, 305 P.3d 641 (2013) (holding that the constitutional harmless error standard applies when court violates a criminal defendant's constitutional right to be present). Under this standard, the party benefitting from the error—the State—must establish beyond a reasonable doubt that there is no reasonable

8

possibility the error affected the verdict. *State v. Ward*, 292 Kan. 541, 568-69, 256 P.3d 801 (2011) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]).

In the context of an issue about a defendant's right to be present during critical stages of a trial, we examine harmlessness by focusing on four factors: (1) the strength of the State's case; (2) the existence of an objection from the defendant; (3) the nature of the proceeding from which the judge excluded the defendant and whether the communication concerned a critical or insignificant matter; and (4) the ability of posttrial remedies to mitigate the error. *State v. Verser*, 299 Kan. 776, 789-90, 326 P.3d 1046 (2014); see *State v. Corey*, 304 Kan. 721, 740, 374 P.3d 654 (2016).

Turning to the first factor, Walker argues the strength of the State's case is questionable because the first two trials resulted in hung juries. We have not previously considered how a hung jury in a prior trial affects the analysis of the strength of the State's case. Courts that have addressed this issue have held that determinative weight should not be given to the fact that a prior trial resulted in a hung jury. Instead, a court should view the lack of a verdict in a prior trial as a factor weighing on the assessment of the strength of the evidence. See *Zappulla v. New York*, 391 F.3d 462, 468-71 (2d Cir. 2004); see also *Ford v. Wilson*, 747 F.3d 944, 954 (7th Cir. 2014) ("[O]nly in close cases should the fact of a prior hung jury lead to a finding of prejudice. . . . This is not such a case because the evidence against [the defendant] was far too strong for us to find prejudice."); *Barker v. Fleming*, 423 F.3d 1085, 1101 (9th Cir. 2005) ("[I]t must be acknowledged that different juries may view the same facts and testimony differently."); *United States v. Newton*, 369 F.3d 659, 680 (2d Cir. 2004) ("A jury may hang for any number of reasons, including the idiosyncratic views of a single juror. Thus, while a prior hung jury may support a finding that an error committed with respect to a very close issue during a retrial is not harmless . . . it does not compel such a conclusion."). We agree with

9

these federal cases. Thus, we acknowledge prior juries have hung, but we do not find it determinative of the strength of the State's case here. We must consider the entirety of the State's case to determine its strength.

Based on our review of the record, we conclude the State's case is strong given the eyewitness testimony and physical evidence against Walker. Michael identified Walker as one of the men who broke into the apartment and as the one who held the gun. Walker's clothing contained Patrick's blood. The gun used to kill Patrick belonged to Walker's girlfriend, and the hat left at the apartment contained Walker's DNA. While Wayne's testimony at the third trial at first pointed to Robinson as the gunman, he later testified consistently with his statements to police and previous testimony pointing to Walker as the gunman.

Walker did not testify at the third trial, although he had before. So the jury heard only his explanation to the law enforcement officers that he had been asleep in Roberts' apartment when the struggle woke him. Not only did the eyewitnesses' testimony contradict this explanation, other evidence undercut it as well. For example, the convenience store video showed the men at the store less than a half hour before Marilyn made the 911 call—a short time for him to have settled in and fallen asleep. The explanation also did not explain Robinson's presence, which was undisputedly established by the presence of Patrick's blood on his clothes and by the shoe he left behind. Nor did Walker's explanation account for the presence of the murder weapon, a gun tied to Walker because it belonged to his girlfriend. Given the strength of the eyewitness testimony and physical evidence against Walker, we conclude the first factor favors the State.

Considering the second factor, Walker did not object to the judge's ex parte communications with the jury. But he did not learn about the first ex parte

10

communication until after it had already happened. We have held the lack of an objection is not dispositive because "an objection serves little purpose where the ex parte communication has already taken place." *Rayton*, 268 Kan. at 719. We apply *Rayton* and conclude Walker's failure to object does not prevent our review.

We turn to the third factor: Did the ex parte communication relate to a critical or insignificant matter and what was the manner of the communication? Generally, an ex parte communication concerns a critical matter when the judge: (1) provides substantive information to jurors, see *Verser*, 299 Kan. at 790; (2) supplies jurors with instructions or evidence not admitted at trial, see *State v. McGinnes*, 266 Kan. 121, 135, 967 P.2d 763 (1998); or (3) discusses possible juror prejudice and the ability of jurors to evaluate evidence objectively, see *Rayton*, 268 Kan. at 719.

Here, the judge did not supply the jury with substantive information, instructions, or evidence. Instead, the judge asked what the jurors read in the notes. The judge ended the ex parte communication after learning the jurors read only Walker's name. Further, the ex parte communication did not involve possible juror prejudice or the ability of the jurors to evaluate the evidence objectively. While the notepad contained witness names from the second trial and a brief description of the subject on which each witness testified, the jurors did not read and the judge did not discuss the witness list with the jurors. Thus, we conclude the ex parte communication concerned no critical matter.

This conclusion does not mean the judge handled the situation appropriately. As we have noted before, we find it troubling whenever a judge invites the jury or some of its members into chambers without notifying the parties. See *Rayton*, 268 Kan. at 720. Thus, the manner of the communication raises concern. Even so, if a judge so errs, we have, in the past, looked at the manner of the judge's communication with jurors. We have also examined the judge's efforts to mitigate the harm by summarizing the ex parte

communication to the defendant and the attorneys—preferably with the jurors present so they may verify or affirm the judge's perception of their communications. See *State v. Martinez*, 288 Kan. 443, 451, 204 P.3d 601 (2009); *Rayton*, 268 Kan. at 720.

Here, the judge first met privately with the juror who gave the notepad to the bailiff without first notifying the parties. The communication appears to have been brief and limited to obtaining factual information about what the juror saw. The judge tried to mitigate any harm this exchange may have created through summarizing the ex parte communication to Walker and the attorneys during deliberations and later questioning the jurors about the notes in the presence of the attorneys. She also offered the attorneys an opportunity to question the jurors, which they declined.

In addition, although Walker should have been present when the judge and attorneys met with the jurors, Walker offers no argument about how his presence might have changed what occurred. His attorney had the information, and the judge offered to allow more inquiry. But Walker's counsel did not take this opportunity.

Although we find fault with the judge communicating with jurors outside Walker's presence, we still conclude the third factor favors the State. No ex parte communication concerned a critical matter, and the judge mitigated the harm by summarizing the ex parte communication to Walker and his attorney and giving opportunities to question the jurors involved.

On the fourth factor, Walker acknowledges he did not file a posttrial motion. The fourth factor hinges on whether the defendant is aware of the ex parte communication. For example, in *Herbel*, 296 Kan. at 1114-15, the defendant failed to file a posttrial motion but the record showed the defendant and his attorney were never aware of the ex parte communication. Based on the defendant's lack of awareness, we determined we

could not hold the defendant's failure to file a posttrial motion against him. Thus, we found the fourth factor in his favor. 296 Kan. at 1115. On the other hand, we found the fourth factor favored the State when the defendant and his attorney were aware of the ex parte communication:

"[B]oth [the defendant] and his counsel were aware of the communication but chose not to pursue any posttrial remedies. This omission deprived the district court and this court of the opportunity to assess whether any harm actually occurred. It also prevented the district court from considering the availability and adequacy of any potential remedy to mitigate any constitutional harm that might have occurred." *State v. Bowen*, 299 Kan. 339, 358, 323 P.3d 853 (2014).

Walker and his attorney were aware of the ex parte communication—the judge informed Walker and his attorney about the first ex parte communication and Walker's attorney was present for the second communication. Yet they failed to file a posttrial motion, so we conclude the fourth factor favors the State. See *Bowen*, 299 Kan. at 358.

In summary, the second factor—whether the defendant objected—is neutral. Walker did not object, but was not present when the error occurred. As a result, the second factor does not weigh against Walker, nor does it favor him. But the first, third, and fourth factors favor the State. Based on the eyewitness testimony and physical evidence against Walker, the judge's efforts to mitigate the harm, and the lack of objection or posttrial motion from Walker, we conclude beyond a reasonable doubt that the error did not affect the outcome of the trial given the entire record. That is, there is no reasonable possibility that the error affected the verdict.

ISSUE 2: *Did the district judge commit reversible misconduct when the judge shredded notes found in the jury room without first showing the notes to Walker and his attorney?*

Walker claims the district judge committed reversible judicial misconduct by shredding the notes found in the jury room. We exercise unlimited review over judicial misconduct claims, and review them in light of the particular facts and circumstances surrounding the allegation. *State v. Hayden*, 281 Kan. 112, 116, 130 P.3d 24 (2006). And we "can review an allegation of judicial misconduct on appeal despite the absence of a contemporaneous objection where the defendant claims his or her right to a fair trial was violated." *State v. Tyler*, 286 Kan. 1087, 1090, 191 P.3d 306 (2008). On appeal, the party alleging judicial misconduct bears the burden of showing prejudice. *State v. Gaither*, 283 Kan. 671, 682, 156 P.3d 602 (2007). Walker thus bears the burden of showing the judge prejudiced his due process rights by shredding the notes without first showing them to Walker and his attorney.

Judicial misconduct warrants a new trial when it affirmatively appears the misconduct prejudiced the substantial rights of the complaining party. "Mere possibility of prejudice . . . is not sufficient to overturn a verdict or judgment." *State v. Miller*, 274 Kan. 113, 118, 49 P.3d 458 (2002). Judicial misconduct prejudices a defendant's substantial rights and warrants a new trial when it: (1) makes the judge appear less than impartial; or (2) pollutes the entire trial. See *Gaither*, 283 Kan. at 683; *Hayden*, 281 Kan. at 124, 126. A judge's misconduct pollutes the entire trial when the misconduct consists of more than an isolated comment or action and the judge fails to purge the taint of the misconduct. See *Gaither*, 283 Kan. at 682-84.

In *Hayden*, we found the judge's misconduct—failing to remain attentive during the trial, repeatedly interrupting the examination of witnesses, treating the attorneys and witnesses rudely and impatiently, and displaying hostility toward the attorneys—polluted

14

the entire trial. 281 Kan. at 117-23, 126. On the other hand, in *Gaither*, we determined the judge's misconduct—losing her temper with, yelling at, and harshly questioning members of the jury venire—did not pollute the entire trial. The judge "purged the taint of the misconduct" by regaining control over her temper and conduct, apologizing to the jury venire, and offering to excuse prospective jurors. 283 Kan. at 684.

Here, the judge committed a single act of misconduct when she shredded the notes found in the jury room without first showing the notes to Walker and his attorney. But the judge did not appear less than impartial because neither Walker nor the State saw the notes before she shredded them. The judge also purged the taint of shredding the notes through several steps. She met with Walker and his attorney to explain what she and the jurors read in the notes. She questioned the jurors who read the notes in the presence of Walker's attorney and the prosecutor. And she asked Walker's attorney and the prosecutor on two separate occasions if they wanted to question the jurors who read the notes. These steps may not have purged the misconduct if either juror had looked at substantive notes, but both testified they saw only Walker's name before closing the notebook.

Thus, the notes' contents did not affect the outcome of the trial and Walker's substantial rights were not prejudiced. For these reasons, we conclude Walker has not shown reversible error. See *Miller*, 274 Kan. at 118.

ISSUE 3: *Did the district judge err during the third trial when it admitted evidence of Walker's interview with law enforcement officers, which he asserts violated his* Miranda *rights?*

Walker claims the district judge erred in admitting his interview statements because he did not voluntarily waive his *Miranda* rights.

15

Detectives Jamie Lawson and Officer Meagan Horvath interviewed Walker three hours after officers apprehended him. When they entered the interview room, Walker had his head down on the table. Detective Lawson immediately asked Walker about his arrest. Lawson informed Walker, "I don't think it's a matter of whether you are or are not involved, it's the reason for your involvement." Lawson then read Walker his *Miranda* rights, and Walker stated he understood. When Lawson asked Walker if he was willing to waive his rights and talk, Walker said "to a certain extent." Walker said he had safety and legal concerns about talking and did not want Lawson to try to manipulate his behavior or trick him. Walker stopped the interview after about 30 minutes.

Walker moved to suppress the statement before his first trial. He claimed he never voluntarily waived his *Miranda* rights. After hearing testimony from Detective Lawson and reviewing the interview recording, the district judge denied Walker's motion. At trial, the district judge admitted the interview statements over Walker's objections.

In determining the voluntariness of a waiver of *Miranda* rights, we review the district judge's factual findings for substantial competent evidence and ultimate legal conclusions de novo. *State v. Bridges*, 297 Kan. 989, 1004, 306 P.3d 244 (2013). We do "not reweigh evidence, pass on the credibility of witnesses, or resolve conflicts in the evidence." *State v. Mays*, 277 Kan. 359, 372, 85 P.3d 1208 (2004).

A defendant's waiver of his *Miranda* rights must be knowing, voluntary, and intelligent under the totality of the circumstances. *Mays*, 277 Kan. at 372. Factors we consider in determining the voluntariness of a defendant's statement include (1) the defendant's mental condition; (2) the duration and manner of the interrogation; (3) the defendant's ability on request to communicate with the outside world; (4) the defendant's age, intellect, and background; (5) the fairness of the officers in conducting the interrogation; and (6) the defendant's fluency with the English language. *State v.*

16

*Betancourt*, 301 Kan. 282, 290, 342 P.3d 916 (2015). Any one factor or a combination of factors may show that the defendant's statement was involuntary under the totality of the circumstances. *State v. Sharp*, 289 Kan. 72, 81, 210 P.3d 590 (2009).

Walker focuses on the second and fifth factors. He argues the three hours he sat in custody before his interview began and the accusatory and unfriendly manner in which Lawson conducted the interview rendered his statements involuntary. Our review of the totality of the circumstances leads us to reject Walker's contentions.

Walker's interview, beginning after 3 hours in custody, lasted 30 minutes. Even if we combine these times, the period remains shorter than many other periods of interrogation we have found voluntary. For example, in *State v. Brown*, 258 Kan. 374, 392-95, 904 P.2d 985 (1995), we found a confession voluntary when the defendant had been in custody for 4 hours before being questioned by officers for at least an hour. We also held a confession voluntary when a defendant sat in the interview room for a little over 3 hours before being questioned for 90 minutes. *State v. Harris*, 293 Kan. 798, 809, 269 P.3d 820 (2012). The length of Walker's time in custody and interview did not render his statements involuntary.

Walker argues Lawson conducted the interview in an accusatory and unfriendly manner by telling Walker that Patrick was dead and the question was not "whether you are or are not involved, it's the reason for your involvement." Telling a felony-murder suspect the victim is dead does not make a statement involuntary. See *State v. Brown*, 305 Kan. 674, 684, 387 P.3d 835 (2017). Nor does urging the suspect to tell the truth, see 305 Kan. at 685, nor asking the "why" of the crime, see *State v. Brown*, 285 Kan. 261, 278, 173 P.3d 612 (2007), as it appears Lawson did when he told Walker the question was not whether Walker was involved, but the reason for Walker's involvement.

17

Lawson told Walker he could end the interview at any time. He read Walker his *Miranda* rights and asked if Walker understood. He did not raise his voice or make promises. And he ended the interview when Walker said it was over.

Considering the totality of the circumstances here, we conclude Walker voluntarily waived his *Miranda* rights. Thus, the district judge did not err in admitting evidence of Walker's interview during the third trial.

ISSUE 4: *Did the district judge err in its response to a jury question during the first trial that asked about Walker's criminal liability arising from evidence related to the case against Robinson?*

Walker next claims the district judge erred in its response to a jury question asked during the first trial. We subject such claims to a two-step analysis. First, we conduct a de novo review to determine if the district judge either failed to respond or provided an erroneous response to the jury's question. Second, if the district judge responded to the jury's request, we review the sufficiency or propriety of the response for abuse of discretion. *State v. Boyd*, 257 Kan. 82, Syl. ¶ 2, 891 P.2d 358 (1995). A district judge's response constitutes an abuse of discretion when no reasonable person would have given the response, the response includes an error of law, or the response includes a factual error. *State v. Wade*, 295 Kan. 916, 920, 287 P.3d 237 (2012) (quoting *Ward*, 292 Kan. at 550).

During the first trial, the jury asked the district judge: "In case the jury decides that the footprint is [Robinson's] footprint, can we hold it against [Walker]?" The prosecutor suggested the judge respond by saying "something like, 'You are to consider the weight you give to the evidence presented,' or something kind of generic like that." The prosecutor explained that "one of the things [the jurors] have to do is, in weighing through [*sic*] the evidence, is decide what they find and then how they apply it overall.

18

It's just their personal process." The judge then discussed the possibility the jury could decide Walker did not intend an unauthorized entry even if it determined the footprint matched Robinson's shoe.

Defense counsel noted "this isn't like an aiding and abetting case." He continued: "The State has not presented any kind of theory of Mr. Walker as aiding and abetting Archie Robinson. There was no aiding and abetting Instruction that was given to the jury, so they have to prove that element of unauthorized entry into the house as to Mr. Walker separate from any finding that they make against Mr. Robinson, the jury." The judge then observed, "[Y]ou don't have to break a door down to have an unauthorized entry." The State essentially agreed the arguments concluded with the prosecutor reiterating that the issue related to the factual questions the jury had to determine and saying, "I don't think you can weigh in in any way in terms of telling them how to hold it against him or not. It is evidence for them to consider, however they want to consider it."

The judge then decided to refer the jury to the aggravated burglary instruction. In response, Walker did not object at trial on the grounds he now asserts. We therefore apply the clear error standard of K.S.A. 22-3414(3). See *State v. Lewis*, 299 Kan. 828, 855, 326 P.3d 387 (2014) (applying clear error to jury instruction issues arising on appeal out of the district judge's response to a deliberating jury's question). To determine whether the judge's response was clearly erroneous, we first consider "whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record." *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 (2012).

An aiding and abetting instruction would have been legally appropriate because the State did not have to charge Walker with aiding and abetting for the district judge to give an instruction on aiding and abetting. See *State v. Butler*, 257 Kan. 1043, 1065, 897 P.2d 1007 (1995), *modified on reh'g*, 257 Kan. 1110, 916 P.2d 1 (1996) ("A trial court

19

may give instructions on aiding and abetting even though the defendant was not charged with aiding and abetting.").

That conclusion leads us to examine the factual appropriateness of an aiding and abetting instruction. We conclude such an instruction would not have been factually appropriate because neither party presented testimony or evidence suggesting Walker aided and abetted Robinson. See, e.g., *State v. Carter*, 305 Kan. 139, 165, 380 P.3d 189 (2016) (instructing the jury that "mere association or presence is insufficient to establish guilt as an aider or abettor" is factually inappropriate when the defendant's own testimony reveals he was far more than just associated or present).

The State positioned Walker as a principal by emphasizing his independent acts. During closing, the State emphasized Walker entered the apartment before Robinson, pointed the gun at Michael, shot and killed Patrick, and struggled with Wayne. Walker similarly eliminated the possibility that he aided and abetted Robinson by positioning himself as a bystander to the crime. Walker explained during his interview that he was staying at Patrick's apartment on the night in question when the noise of a struggle woke him. Even Walker's attorney observed, during the discussion that took place in response to the jury's question, that "this isn't like an aiding and abetting case" and the "State has not presented any kind of theory of [Walker] as aiding and abetting [Robinson]."

We thus conclude an aiding and abetting instruction would not have been factually appropriate. So we conclude the district judge did not err by not instructing the jury on the law of aiding and abetting.

20

ISSUE 5: *Does cumulative error require reversal of Walker's convictions?*

Finally, Walker argues his felony-murder conviction should be reversed because of cumulative error. We apply unlimited review to claims of cumulative error. *State v. Cruz*, 297 Kan. 1048, 1074, 307 P.3d 199 (2013). In conducting that review, we consider a defendant's alleged errors collectively to determine whether the combined error, under the totality of the circumstances, is so great that reversing the conviction is required. In making that assessment, we examine

> "the errors in the context of the record as a whole considering how the trial court dealt with the errors as they arose, including the efficacy, or lack of efficacy, of any remedial efforts; the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence." *State v. Warrior*, 294 Kan. 484, 517, 277 P.3d 1111 (2012).

We have found two errors in Walker's case: (1) the district judge's ex parte communications with the jury about the notes found in the jury room, and (2) the district judge's shredding of the notes found in the jury room without showing the notes to Walker and the attorneys.

These interrelated errors impact only the third trial and thus do not affect Walker's aggravated burglary conviction. As to the effect on Walker's felony-murder conviction, we conclude the remedial efforts taken by the district judge diminished the significance of the interrelationship of the two errors. See *State v. Tully*, 293 Kan. 176, 206, 262 P.3d 314 (2011) (holding that the interrelationship of errors is significant when the evidence against the defendant is not overwhelming). The district judge took steps to remedy both errors. She summarized the ex parte communications to Walker and the attorneys, explained what she read in the notes to Walker and the attorneys, questioned the jurors about the notes in the presence of the attorneys, and asked the attorneys on two separate occasions if they wanted to question the jurors about the notes.

21

In addition, the State presented strong evidence of Walker's guilt. See *State v. Parks*, 294 Kan. 785, 804, 280 P.3d 766 (2012) ("Reversal for cumulative error is not required if the evidence against a defendant is overwhelming."). Michael identified Walker as one of the two men who broke into the apartment and walked toward Patrick's room. Michael and Wayne both identified Walker as the gunman. Walker's clothing contained Patrick's blood, the gun used to kill Patrick belonged to Walker's girlfriend, and the hat left at the apartment contained Walker's DNA. The presence of Walker's girlfriend's gun, its use as the murder weapon, and the tension between his statements to officers and the other evidence greatly undermined his defense.

Given the remedial efforts taken by the district judge and overwhelming evidence against Walker, the two errors, considered together, do not warrant reversal under the cumulative error doctrine. Walker was not entitled to a perfect trial, and he received a fair one. See *State v. Todd*, 299 Kan. 263, 287, 323 P.3d 829 (2014).

Affirmed.