NOT DESIGNATED FOR PUBLICATION

No. 126,933

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CARL JOSEPH REED,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS M. SUTHERLAND, judge. Submitted without oral argument. Opinion filed September 26, 2025. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., ARNOLD-BURGER and BRUNS, JJ.

PER CURIAM: A jury convicted Carl Joseph Reed of one count of rape, two counts of aggravated criminal sodomy, and one count of promoting obscenity to a minor. Reed now appeals his convictions, raising several claims of error. After a thorough review of the record we find no errors in Reed's trial requiring reversal of his convictions. We affirm the decision of the district court.

1

FACTUAL AND PROCEDURAL HISTORY

The issues raised on appeal are unrelated to the underlying facts of the crime for which Reed was convicted. Suffice it to say Reed's eight-year-old victim, H.R., told her grandparents that Reed was sexually abusing her. It was these allegations as well as evidence collected at places the abuse occurred and evidence collected from Reed that ultimately resulted in his convictions for rape, two counts of aggravated criminal sodomy, and promoting obscenity to a minor. We will include additional facts as necessary as part of the legal analysis of Reed's issues on appeal.

Because Reed was indigent, the district court appointed a public defender to represent him at the outset of the case. In the ensuing three years, the district court replaced Reed's appointed counsel five times:  three at Reed's request because of perceived communication issues and twice because of conflicts of interest. Johnson County District Court Judge Thomas Sutherland presided over Reed's entire case. Again, more details regarding Reed's legal representation will be set out below, but Reed represented himself at his jury trial with backup appointed counsel.

During the three-day jury trial, the district court judge was presented with a question from the jury, which he answered outside the presence of the parties. The jury ultimately found Reed guilty on all counts.

The court sentenced Reed to life sentences without the possibility of parole for 25 years on the rape conviction and aggravated criminal sodomy convictions, running two counts consecutive for a total controlling sentence of life without the possibility of parole for 50 years. The court also imposed a concurrent 12-month sentence on the promoting obscenity to a minor conviction.

Reed timely appealed.

ANALYSIS

I.     THE DISTRICT COURT DID NOT VIOLATE REED'S RIGHT TO COUNSEL

Reed argues first that he was denied his right to counsel under the Sixth Amendment to the United States Constitution because the district court allowed him to represent himself at trial without making a finding that he knowingly and intelligently waived this right. He also claims the district court mistakenly conflated the justifiable dissatisfaction standard with the legal standards that apply when ensuring a defendant validly waives their right to counsel. The State counters that Reed admits he was sufficiently advised of his rights, and his only complaint is that the court failed to use the "magic words" specifically finding that he knowingly and intelligently waived his right to counsel. The State also asserts the court faced a "binary decision," so allowing Reed to represent himself necessarily shows it found his waiver was valid.

A. *We review Reed's constitutional challenge.*

Reed admits he did not object to the lack of a specific waiver finding in the district court but asserts this court should consider this issue for the first time on appeal because it is necessary to prevent the denial of a fundamental right. See *State v. Allen*, 314 Kan. 280, 283, 497 P.3d 566 (2021) (exceptions to general rule that new issues cannot be raised for first time on appeal); see also *State v. Burden*, 311 Kan. 859, 863, 467 P.3d 495 (2020) (describing right to counsel as a fundamental right). We agree. The State's attempt to refute the application of this exception by framing Reed's claim as one challenging the adequacy of the district court's findings is unpersuasive, as even the State acknowledges the right to counsel is fundamental.

B. *Additional facts are necessary to provide context for the district court's ruling.*

Understanding the full context of Reed's transition to pro se status requires looking back at the history of his representation throughout the case.

Reed's first appointed counsel was Brandon Hottman, who the district court appointed upon the filing of charges in March 2020. Reed then asked for substitute counsel in March 2021, complaining primarily about inadequate communication with Hottman. Hottman validated Reed's complaint but also explained that the lack of communication was partially due to Reed's insistence on an in-person preliminary hearing, which had delayed the case since in-person hearings were not being scheduled during the COVID-19 pandemic. While the court agreed with Hottman's explanation, it granted Reed's request for substitute counsel and appointed Jason Billam.

About four months later at a scheduled preliminary hearing, Reed asked the district court to dismiss Billam, complaining that he only ever wanted to discuss plea bargains with Reed. The court confirmed that Reed understood that only certain decisions were within his control as a criminal defendant, including "whether to take a plea or go to trial, whether to testify at trial, issues like that." The court also confirmed that Reed understood appointing new counsel would require a continuance of the preliminary hearing, which would prevent the speedy trial clock from beginning to run. The court further advised Reed that if he had similar complaints about his next attorney, Billam's replacement "will probably be the last one I appoint to you" unless he somehow was able to hire his own attorney. Reed said he understood. Thus, the court allowed Billam to withdraw and appointed Zane Todd.

The district court allowed Todd to withdraw around October 2021 due to a conflict of interest, appointing Michael Bartee to replace him.

4

The preliminary hearing occurred in June 2022, at which Bartee represented Reed. The following month, the district court scheduled a jury trial at Bartee's request to occur in December 2022.

In August 2022, Reed filed a pro se motion to discharge Bartee and appoint substitute counsel, again expressing dissatisfaction with the level of communication. At a hearing on the motion, the district court explained it would be difficult to find someone who would be ready for trial in just a few months. The court further explained that "a skeptic like me might think you are doing this simply to delay the inevitable, the inevitable being trial" and that "no matter who I appoint to you, in another two or three months you are going to make the same argument as to them that is probably not correct." Reed disagreed, stating he wanted new counsel because Bartee had made a comment that Reed's rights were "above his pay grade." After reiterating the previous advisements about the roles of criminal defendants and their counsel, the court confirmed that Reed understood replacing counsel would result in another delay. The court also advised Reed that if he made a similar complaint about the next attorney, "I am going to be then convinced that all you are doing is delaying the obvious." Reed said he understood, indicating that he was contemplating hiring an attorney. As a result, the court set out the case for 90 days to allow Reed time to retain counsel.

At a scheduling conference in November 2022, Reed explained his plans to hire an attorney "fell through," so he needed additional time to "rally some more money up for an attorney." The court agreed to give Reed an additional 45 days but would also begin searching for someone to appoint, which Reed agreed to accept. About two weeks later, the court appointed Thomas Penland to represent Reed.

Then, in January 2023, Reed filed a pro se motion requesting transcripts for every hearing that had occurred in his case. Shortly thereafter, the district court allowed Penland to withdraw due to a conflict of interest and appointed Scott Toth to represent

5

Reed. The following month, Reed filed another pro se motion to expedite his previous request for transcripts.

At a March 2023 hearing, Toth informed the district court that Reed had recently mailed a pro se motion to discharge Toth that had not yet been received by the court. In the filing, Reed alleged that Toth had violated Kansas Rules of Professional Conduct by misleading Reed and providing incompetent counsel because Reed had not received copies of the requested transcripts. The court construed the pending motion as an oral request and denied it, explaining that Toth was a highly skilled and experienced attorney who had control over matters of trial strategy and had deemed the transcripts unnecessary. In response, Reed stated that he would be filing disciplinary actions against both Judge Sutherland and Toth, which Reed stated would "be a conflict of interest." Judge Sutherland explained that Reed was free to file his complaints, but that he believed Reed was "simply attempting to delay what you may believe to be the inevitable" and advised Reed that the upcoming April 2023 trial date would remain on the calendar.

Near the end of March 2023, the State moved for a trial continuance because of witness availability, which the district court considered at a hearing on April 13, 2023. The court ultimately decided—without objection from Reed—to reschedule the trial to begin on July 17, 2023. But when the court initially inquired about the defense's position on the continuance, Toth explained that he had not discussed the matter with Reed because Reed refused to speak with Toth. Reed explained he was not speaking to Toth because of a conflict of interest, referring to a letter from the disciplinary committee telling him that the complaint was under investigation.

Judge Sutherland said he would "first try to address this the easy way, and then later the hard way if I have to." He stated that Reed was very lucky to have Toth as his attorney because of his background as a prosecutor and now criminal defense attorney with experience representing defendants charged with similar crimes as Reed. The court

6

continued, referencing the discussion from the previous hearing, informing Reed about the trial decisions within his control and those within his attorney's purview as matters of trial strategy. He concluded by informing Reed that "if I find that your efforts are merely an attempt to delay, I can find that you have waived your right to have an attorney appointed to you, and I am at that point now." Thus, Reed had "two options. . . . Option 1, you proceed to trial with Mr. Toth; Option 2, you proceed to trial with no attorney representing you. You may say, Well, what is Option 3? There is none." The court advised Reed he did not need to decide immediately and should endeavor to cooperate with Toth, but that Toth would not be removed from the case "period."

Two weeks after the April 2023 hearing, Reed filed a second pro se motion to discharge Toth and for appointment of new counsel, repeating his allegation about a conflict of interest due to the pending disciplinary complaint. The district court denied Reed's motion four days later, noting that the disciplinary complaint had been dismissed after an investigation revealed no unethical conduct on Toth's part. The order further reiterated the court's previous comments about Reed being lucky to have an attorney with Toth's experience willing to represent him. Lastly, the order affirmed its previous rulings that "[n]o additional attorneys will be appointed to represent Defendant," and that "[i]f Defendant fails to cooperate with Mr. Toth, Defendant will have waived his right to counsel and will proceed to trial pro se." In a footnote, the court indicated Toth would remain in the case as standby counsel if Reed chose to represent himself.

Accordingly, at the June 2023 hearing, the district court began by asking Reed whether he intended to proceed to trial with Toth's representation or represent himself. Reed stated he wanted to represent himself. The court then advised Reed that although the Sixth Amendment guarantees criminal defendants the right to assistance of counsel, that did not include the right to compel counsel of choice. Defendants needed to show "good cause" or "justifiable dissatisfaction" to justify appointment of substitute counsel, which Reed had failed to do. The court continued, explaining the right to counsel

7

includes "two ways that can be accomplished. You can hire someone yourself, but I think we determined you do not have the funds to do so. The second way is for the Court to appoint counsel, which I have done now on four occasions." The court then referenced its previous discussions with Reed explaining which trial decisions are within his control and which rested within the sole discretion of his attorney. The court further reiterated that "Mr. Toth is not only a skilled and experienced counsel, he is also skilled and experienced in this particular kind of case," and that "if you had enough money to hire whoever you wanted to hire, you couldn't hire a better attorney than Mr. Toth to represent you in a case like this."

    The district court then explained:

> "So I certainly cannot force you to be represented by counsel. It is your right to proceed pro se. But I also can find that you can waive your right to appointed counsel. And *I am going to make that finding this time—that you have waived your right to appointed counsel, because there is no justifiable dissatisfaction* with Mr. Toth— justifiable reason to have him removed from the case.
>
> "And with all due respect*, I make this specific finding that the only reason that you don't want to proceed to trial with Mr. Toth is because of a desire on your part to delay and hinder the proceedings*. I have every reason to believe that no matter who I appointed to represent you, you would have the exact same complaints. So taking Mr. Toth off the case and appointing new counsel would be of no benefit to you or the Court or the State, because you would make the exact same complaint." (Emphases added.)

    Just after, the district court stated that since Reed wished to proceed pro se, "[t]here are certain things that I need to advise you of." Thus, the court explained:

> "First of all, if at any time between now and the beginning of the trial proceedings or during the trial, you change your mind and wish to have Mr. Toth represent you, you can let me know that, and I will have Mr. Toth step in.

"And, in fact, I am specifically ordering Mr. Toth to be present at trial to be backup counsel. He will be with you at all stages of the trial, and if at any time you wish to have him step in and take over as your attorney, all you have to do is let me know you wish to have that happen, and that will happen.

"There will be no postponement—would be permitted at the time of trial or during the trial because you want to bring in newly-appointed counsel. Because if you want someone to step in and represent you, it will be Mr. Toth.

. . . .

"Also, Mr. Reed, the Court may and will terminate your self-representation if I believe that you deliberately engage in serious obstructionist misconduct before the Court or in any proceeding. In other words, if you begin to act up in court, begin to be disrespectful, doing things that are simply improper, or, frankly, if you decide to sit there like a bump on a log and not do anything, I can exercise the right of terminating your right to proceed pro se and have Mr. Toth step in.

"I can also do that any time I believe that the actions you are taking are detrimental to your case, based on how you're asking questions, what questions you are asking. If I believe at any time your actions or inactions become detrimental to your interests, I can ask Mr. Toth to step in.

"If you do proceed pro se to represent yourself, you must follow all rules applicable to the trial. In other words, even though you are not an attorney, you will be required to follow any and all laws regarding criminal procedure and criminal substantive law. I cannot treat you differently than an attorney just because you are not legally trained.

"There are certain numerous dangers and disadvantages to you representing yourself. They are as follows:  The law provides for numerous pretrial motions available to you which are of a technical nature, the advantage of which you may lose if allowed to represent yourself or herself. In other words, that is a fancy way of saying some issues may arise—[the prosecutor] may raise them, and you may not understand the technical ramifications of those or the legal ramifications; but if you don't, it's kind of too bad. That's up to you to have been able to understand that, because you have Mr. Toth representing you.

"Your vocabulary may impede clear communication with the Court and opposing counsel. In other words, you may not be familiar with the legal terms that are common to

Mr. Toth, [the prosecutor], that they would understand how to communicate with each other, but you would not.

"I cannot act as your attorney. You cannot look at me and say, 'Judge, what do I do? What do I say? I'm not sure what I'm supposed to do at this point.'

"I cannot give you legal advice during the proceedings. I cannot act as your lawyer. And I cannot give you preferential treatment just because you are not represented by counsel.

"[The prosecutor] is here to prosecute you. She's not here to help you. She has no obligation whatsoever to help you during these proceedings. Her obligation is to fairly present the evidence to trial—to be an advocate on part of the State and not an advocate on your behalf.

"The rules of law can be highly technical and will not be set aside by me or ignored simply because you are pro se.

"You may unknowingly waive some of your constitutional and statutory rights. We mentioned the right of you not having to testify at trial. There may be other constitutional or statutory rights that Mr. Toth is well aware of and could protect you from, that you may not be aware of, and you could unconsciously waive those by something that you say or some inaction on your part.

"You are in custody, obviously. You are in jail. It can be very difficult for someone in your position to locate witnesses, talk to witnesses, look at discovery, that sort of thing. Mr. Toth can do that because he is an experienced, practicing attorney. And you will not have that same advantage."

The district court then asked Toth about the maximum potential penalty Reed could face if convicted, to which Toth explained the State had charged Reed with three off-grid felonies that each carried a mandatory life sentence without the possibility of parole for 25 years. Toth further agreed with the court's suggestion that parole boards rarely granted early parole for the types of offenses Reed had been charged with.

The district court then asked Reed whether he still wanted to represent himself "[k]nowing all those things that I just mentioned to you," to which Reed simply said, "Yes." The court responded:

"All right. Well, I believe, that under the law, I have no choice but to allow you to proceed, at least to begin with, without Mr. Toth as your attorney. But I have mentioned several different instances in which, whether you like it or not, I could interrupt the proceedings and have Mr. Toth begin representing you."

Then, to "cover all the bases," the district court continued to advise Reed that if he tried to remain in his jail cell on the day of trial, deputies would remove him from the cell and bring him over to the courthouse. The court also advised Reed he could be removed from the courtroom if he became disruptive at trial. The court explained he was not "trying to be mean," but simply "trying to do you a favor by encouraging you to have Mr. Toth represent you. But I just have to make sure that you go into this with your eyes wide open, and you know what you may be facing, which may be life in prison." Reed responded, "Which I was already aware of." For a final time, the court asked again if Reed still desired to proceed pro se and Reed responded, "Yep."

At a pretrial hearing the Friday before trial, the district court began by asking Reed "if you've come to your senses and are willing to allow Mr. Toth to represent you in this case." Reed responded, "No, I do not want him to represent me." The court again reminded Reed that he needed to follow all rules of criminal procedure as if he were a lawyer and that he was facing multiple potential life sentences. Reed said he understood. The court added that Reed might be disadvantaged if the jury saw that he was "not doing . . . particularly well" representing himself because they might believe he had "given up." Reed disagreed, stating "[i]t can work the opposite way, from what I have been studying." The court then confirmed that Reed understood the State's outstanding plea offer, which would reduce the potential penalty to 240 months in prison. After clarifying aspects of the trial procedures with the parties, the court advised Reed "if you come to your senses and realize that maybe your best opportunity, if any, is to have Mr. Toth represent you, I'd sure make that decision sooner versus later." Reed responded, "As you

made perfectly clear, he—I'm supposed to work for him. I would rather ask the questions I got, what I want answered."

Reed remained pro se for most of the trial, confirming at the beginning of both days that he wished to continue representing himself. During this time, he performed several tasks—exercising peremptory strikes during jury selection, making opening statements, and cross-examining witnesses—without ever objecting to his pro se status or otherwise expressing frustration about how the trial was conducted. Just before the State called its final witness, Reed asked if Toth could take over and the court honored the request. Toth then took over, unsuccessfully objecting to the publication of the Sunflower House interview video as cumulative and moving for a directed verdict, then later participated in the jury instruction conference and made closing arguments.

C. *The Sixth Amendment Right to counsel is examined.*

The Sixth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment, guarantees criminal defendants the right to the assistance of legal counsel during all critical stages of a criminal proceeding. *Miller v. State*, 298 Kan. 921, 929, 318 P.3d 155 (2014). A violation of the right to counsel at trial results in structural error. Structural errors defy analysis by harmless error standards because they affect the framework within which the trial proceeds. *State v. Johnson*, 310 Kan. 909, 913-14, 453 P.3d 281 (2019). An appellate court exercises unlimited review over questions involving a defendant's right to counsel. *State v. Bunyard*, 307 Kan. 463, 470, 410 P.3d 902 (2018).

An indigent defendant charged with a felony or a serious misdemeanor crime in a state court has the unfettered right to court-appointed counsel. *Gideon v. Wainwright*, 372 U.S. 335, 343-45, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963). But the right to counsel is not entirely without limits because a defendant cannot "'compel the district court to appoint

the counsel of [his or her] choice.'" *State v. Brown*, 305 Kan. 413, 424, 382 P.3d 852 (2016). Moreover, an indigent defendant must show justifiable dissatisfaction to warrant substitution of counsel. *State v. Breitenbach*, 313 Kan. 73, 90, 483 P.3d 448 (2021); *State v. Sappington*, 285 Kan. 158, 166, 169 P.3d 1096 (2007). Likewise, the right to counsel "cannot be manipulated to impede the efficient administration of justice." *State v. Anthony*, 257 Kan. 1003, 1019-20, 898 P.2d 1109 (1995) (citing *State v. Bentley*, 218 Kan. 694, 695, 545 P.2d 183 [1976]).

The Sixth Amendment also implicitly includes a right to self-representation. *Burden*, 311 Kan. at 863 (citing *Faretta v. California*, 422 U.S. 806, 821, 95 S. Ct. 2525, 45 L. Ed. 2d 562 [1975]). "Because the right to represent oneself is 'at odds with the right to be represented by counsel, the courts must indulge every reasonable presumption against waiver of the right to counsel[ ] and will not presume acquiescence in the loss of fundamental rights, i.e., the right to counsel.'" *Burden*, 311 Kan. at 863. But a criminal defendant can expressly waive their right to counsel, so long as the waiver is made voluntarily, knowingly, and intelligently. *State v. Trass*, 319 Kan. 525, 538, 556 P.3d 476 (2024).

D. *Reed waived his right to court appointed counsel.*

As Reed notes, this court previously suggested a procedure for ensuring the validity of a defendant's waiver of the right to counsel in *State v. Lowe*, 18 Kan. App. 2d 72, 76-77, 847 P.2d 1334 (1993). Reed's argument complains that the district court inverted this procedure by first finding he waived his right to counsel before ensuring he understood what that right entailed. In other words, Reed asserts the court needed to first review the so-called "*Lowe* factors" before concluding with a specific finding on the record that he knowingly and intelligently waived his right to counsel.

Contrary to Reed's argument, the *Lowe* factors are merely a suggestion, not a mandatory procedure that must be followed before allowing a defendant to represent themselves. In fact, the Kansas Supreme Court has held no specific checklist is required when assessing whether a valid waiver occurred. Instead, courts must assess the sufficiency of a waiver of the right to counsel "by examining the circumstances of each case." *Burden*, 311 Kan. at 864; see also *State v. Buckland*, 245 Kan. 132, 137, 777 P.2d 745 (1989) ("Waiver of the right to counsel must be knowingly and intelligently made and the determination of such a waiver depends on the particular facts and circumstances of each case.").

Even so, the Kansas Supreme Court has adopted its own framework for courts to follow to ensure a defendant knowingly and intelligently waives their right to counsel:

> "First, a court should advise the defendant of the right to counsel and to appointed counsel if indigent. Second, the defendant must possess the intelligence and capacity to appreciate the consequences of his or her decision. And third, the defendant must comprehend the charges and proceedings, punishments, and the facts necessary for a broad understanding of the case." *Burden*, 311 Kan. at 863.

But an express waiver following "an affirmative written or verbal statement on the record" that the defendant wants to represent themselves is only one method by which a criminal defendant can relinquish their right to counsel. *Trass*, 319 Kan. at 538-39. A criminal defendant can also *implicitly* waive their right to counsel by their conduct, particularly after a court warns the defendant that continuing to engage in delay tactics will result in a waiver. 319 Kan. 539; see also *United States v. Hughes*, 191 F.3d 1317, 1323 (10th Cir. 1999) (recognizing waiver of right to counsel by conduct, "particularly when that conduct consists of tactics designed to delay the proceeding"); *United States v. Moore*, 706 F.2d 538, 540 (5th Cir. 1983) ("We conclude that a persistent, unreasonable demand for dismissal of counsel and appointment of new counsel, as herein discussed, is the functional equivalent of a knowing and voluntary waiver of counsel."). But even with

14

an implicit waiver, "'[a] court is under no less obligation to ensure that [a] waiver is knowing and intelligent when voluntariness is deduced from conduct than when it is asserted expressly.'" 319 Kan. at 539 (quoting *United States v. Allen*, 895 F.2d 1577, 1579 [10th Cir. 1990]).

As recently as 2024, in *Trass*, our Supreme Court recognized that a criminal defendant can forfeit their right to counsel. 319 Kan. at 541-43. But forfeiture is an "extreme sanction" because it can happen "without warning or an opportunity to conform conduct to an appropriate standard" following "egregious misconduct or a course of disruption related to counsel with an intent to thwart judicial proceedings." 319 Kan. at 543.

Recognizing these distinctions makes it immediately apparent why the district court handled Reed's request to proceed pro se in the manner it did. The record shows that the court had warned Reed—as early as July 2021—of its belief that he was engaging in delay tactics by seeking to replace his appointed counsel for trivial reasons. Although Reed eventually made several affirmative statements on the record that he wished to proceed pro se, those statements only came after a final warning at the April 2023 hearing in which the court presented Reed with a binary choice:  proceed to trial with Toth or proceed pro se with Toth as standby counsel. While Reed is correct that the court referenced his failure to show justifiable dissatisfaction at the June 2023 hearing, he omits the portion of the court's finding "that the only reason that you don't want to proceed to trial with Mr. Toth is because of a desire on your part to delay and hinder the proceedings." Thus, contrary to Reed's point, the district court did not simply conclude that Reed's failure to show justifiable dissatisfaction with Toth's representation meant he waived his right to counsel.

While both parties discuss this issue solely in terms of an express waiver of the right to counsel, the record shows the court was prepared to find Reed implicitly waived

15

his right to counsel by his conduct even before he chose to invoke his right to self-representation. With that clarification in mind, the district court's efforts to ensure that Reed knowingly and intelligently understood the consequences of waiving his right to counsel are placed in the proper context.

Now, to support his argument, Reed relies primarily on two decisions from this court, but both are distinguishable for the points raised. First based on *State v. Allen*, 62 Kan. App. 2d 802, 809, 522 P.3d 355 (2022), Reed contends that allowing him to represent himself without a proper determination of whether his decision to proceed pro se was knowingly and intelligently made rendered any waiver ineffective. The difference in that case, however, is that the district court allowed Allen to represent himself for 14 months before finally advising him at a separate hearing of his legal rights and the disadvantages of pro se representation. Here, the district court only allowed Reed to begin serving as his own attorney after engaging in a comprehensive explanation of his right to counsel, the consequences of choosing to represent himself, and the nature of the charges and potential penalty he faced.

Reed also relies on *State v. Seymour*, No. 125,961, 2024 WL 3596866 (Kan. App.) (unpublished opinion), *rev. denied* 319 Kan. 836 (2024), to argue that any waiver after the district court's colloquy at the June 2023 hearing was ineffective because the court had already violated Reed's right to counsel by that point. To review, at the June 2023 hearing, the judge had already refused to remove Reed's court-appointed counsel in April, finding no grounds to do so since the ethical complaint that had formed the basis for Reed's assertion that there was a conflict of interest had been dismissed as unfounded. The court indicated that Reed either needed to work with his court appointed counsel or proceed pro se. The court further noted that even if Reed elected to proceed pro se, his court-appointed attorney would remain on the case as standby counsel. At the June hearing, the court went over the benefits of proceeding with court-appointed counsel and the dangers of proceeding pro se and Reed elected to proceed pro se. As promised, the

judge required court-appointed counsel to prepare for trial and attend trial as standby counsel, a role he was called upon by Reed to fulfill.

These facts are dramatically different than those in *Seymour*, upon which Reed relies. Although the district court's refusal to replace Seymour's *retained* counsel was also tied to a failure to show justifiable dissatisfaction, a panel of this court found that Seymour could discharge his retained counsel without showing justifiable dissatisfaction and request appointed counsel, if indigent. The district court incorrectly believed Seymour's only options were to proceed with retained counsel or represent himself. That belief led to the court ignoring the defendant's request to replace his retained counsel with appointed counsel, then compounding the error by failing to advise the defendant he could still request a court-appointed attorney. 2024 WL 3596866, at *8.

Put simply, Reed misconstrues the district court's initial reference to the justifiable dissatisfaction standard here as a conflation of the waiver requirements. Reed's point would be more convincing if the court had merely accepted Reed's request to proceed pro se without any further discussion. Instead, the court responded to Reed's request by first summarizing its previous discussions with Reed on the matter, then immediately engaging in a lengthy explanation of the right to counsel, the various dangers of self-representation, and possible consequences. After that discussion, Reed confirmed he wanted to represent himself. The district court then continued to advise Reed about aspects of the trial process and what might happen if Reed refused to participate at trial or became disruptive. Reed confirmed yet again that he understood and still wanted to represent himself. These interactions indicate reluctant acceptance of Reed's decision, but the court nonetheless determined Reed knowingly and intelligently waived his right to counsel.

At a later hearing, the district court continued to ensure Reed wanted to proceed pro se and gave similar advisements. The court also asked Reed at the beginning of each

17

day of trial if he still wanted to represent himself, which he yet again confirmed. Leading up to and during trial, the court even repeatedly encouraged Reed to change his mind and allow Toth—who remained in the case as standby counsel—to take over, which ultimately did occur.

In sum, the facts and circumstances of this case show that the district court went to great lengths to ensure Reed knowingly and intelligently waived his Sixth Amendment right to counsel. The district court did not violate Reed's rights by allowing him to represent himself at trial.

II.     THE DISTRICT COURT'S EX PARTE COMMUNICATIONS WITH THE JURY DO NOT REQUIRE REVERSAL OF REED'S CONVICTIONS

Reed next argues the district court committed reversible error by engaging in ex parte communications with the jury during deliberations, violating his constitutional right to be present at every critical stage of trial. The State concedes error but argues it was harmless for various reasons.

There can be no dispute that the district judge erred. The record shows that the district court responded to a question from the jury about receiving a transcript of H.R.'s testimony without consulting the parties. Although neither side objected to the court's response referring the jury back to instructions, error nonetheless occurred. See *State v. Rayton*, 268 Kan. 711, 720, 1 P.3d 854 (2000); see also K.S.A. 22-3405(a) ("The defendant in a felony case shall be present at . . . every stage of the trial . . . except as otherwise provided by law."); K.S.A. 22-3420(d).

The question, thus, turns to whether that error requires reversal or if this court can consider it harmless. When reviewing a violation of the defendant's right to be present during all critical stages for harmless error, this court applies the federal constitutional harmless error standard. The party benefitting from the error—the State—must establish

18

beyond a reasonable doubt that there is no reasonable possibility the error affected the verdict. *State v. Ward*, 292 Kan. 541, 568-69, 256 P.3d 801 (2011) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967]). In reviewing this type of error for harmless error, appellate courts look at four factors: (1) the strength of the State's case; (2) the existence of an objection from the defendant; (3) the nature of the proceeding from which the judge excluded the defendant and whether the communication concerned a critical or insignificant matter; and (4) the ability of posttrial remedies to mitigate the error. *State v. Walker*, 308 Kan. 409, 415, 421 P.3d 700 (2018).

   A. *The State's case was strong.*

   On the first factor, Reed contends the evidence of his guilt was not overwhelming because it came down to whether the jury believed H.R. beyond a reasonable doubt. See *State v. McGinnes*, 266 Kan. 121, 133, 967 P.2d 763 (1998) (finding evidence was "balanced" because it came down to a credibility contest between defendant and victim). Reed correctly notes no other witnesses observed the sexual abuse described by H.R. in her Sunflower House interview and trial testimony, and that the sexual assault examination performed at Children's Mercy Hospital revealed no signs of physical trauma. But unlike *McGinnes*, Reed offered no evidence to refute anything offered by the State—in other words he did not present a credibility contest. Moreover, as the State explains, there was other evidence to corroborate H.R.'s allegations.

   For example, Reed contends the forensic evidence did not corroborate H.R.'s claims, just that his DNA was found in several locations around the house. But contrary to this point, the DNA samples were collected from stains containing Reed's semen in locations like H.R.'s bedroom and the hallway, places H.R. had specifically mentioned the sexual abuse occurred. Moreover, the most recent incident described by H.R. occurred after Reed checked her out of school for a dentist appointment, which was corroborated by school and dental records presented by the State. Lastly, H.R. stated that

19

Reed showed her pictures on his phone of children performing oral sex on adult men, acts which H.R. then performed on Reed. When the officers were executing a search warrant on Reed's phone, they discovered several open browser tabs of pornographic sites referencing images and videos of "[y]oung" girls. As a result, this factor weighs in the State's favor.

B. *Reed had no meaningful opportunity to object.*

Moving briefly to the second factor, Reed's failure to object to the district court's ex parte communication does not weigh in the State's favor. By the time the court disclosed the error on the record, the jury had already reached a verdict. So any objection by Reed at that point would serve little purpose in affecting the outcome.

C. *The communication did not involve a critical matter*.

As for the third factor, Reed contends it is impossible to know whether the district court's error concerned a critical or insignificant matter because the interaction was not recorded. He suggests that the court may have answered the jury's question inaccurately or otherwise gave the impression that the jury should not review H.R.'s testimony more carefully. But as the State notes, these concerns are pure conjecture. We know from the court's statements on the record that he simply referred it back to the jury instructions. In particular, Instruction No. 12 stated:

> "Written transcripts of the testimony of witnesses are not immediately available. Should you wish to review the testimony of a witness, you need to make the request in writing, specifying which witness, and deliver it to the Bailiff. The Court will then arrange for a read back of the entire testimony of the witness. Your patience will be required as some preparation is necessary."

20

Likewise, Instruction No. 13 directed: "When you retire to the jury room you will be provided with each exhibit that was admitted into evidence. Exhibits which may have been marked or otherwise referred to, but which were not admitted into evidence will not be made available to you." Reed objected to neither instruction, and he does not assert on appeal that they were incorrect or that the court should have responded differently. Nothing about the court's response suggested the jury should disregard H.R.'s testimony in favor of the statements she made during the Sunflower House interview. In fact, the court encouraged the jurors to request a readback if that was the jury's desire, but they chose not to do so. Although Reed should have been present during this interaction, he offers nothing to explain how his presence might have changed the outcome.

D. *Reed made no attempts at posttrial mitigation.*

Finally, on the fourth factor, Reed contends no posttrial remedy could have mitigated the constitutional error that occurred because of the district court's ex parte communication with the jury. Yet the Kansas Supreme Court has weighed this factor in the State's favor when the defendant fails to file any posttrial motion after learning about an ex parte communication. See *Walker*, 308 Kan. at 419. Such an omission deprives the district court of an opportunity to assess harm or consider the availability and adequacy of any potential remedy, as well as deprives this court of the same. *State v. Bowen*, 299 Kan. 339, 358, 323 P.3d 853 (2014) (citing *Rushen v. Spain*, 464 U.S. 114, 104 S. Ct. 453, 78 L. Ed. 2d 267 [1983]) ("'The prejudicial effect of [a judge's failure to disclose an ex parte communication with a juror] can normally be determined by a posttrial hearing.'"). As a result, this factor should weigh in the State's favor as well.

In sum, based on a review of the relevant factors, we find that the district court's erroneous ex parte communication with the jury was harmless beyond a reasonable doubt.

21

III.    THE DISTRICT COURT DID NOT CLEARLY ERR IN FAILING TO INCLUDE A
        MULTIPLE COUNTS INSTRUCTION

Reed next argues the district court erred when it failed to provide a multiple counts instruction, particularly regarding the two counts of aggravated criminal sodomy. He contends that providing identical elements instructions and verdict forms for each count without differentiating between the alternative means of committing each offense—anal penetration or oral contact of H.R.—meant the jury could have convicted him of both counts based on the same alternative means.

When analyzing jury instruction issues, appellate courts follow a well-known three-step process:  (1) determining whether the appellate court can or should review the issue, in other words, whether there is a lack of appellate jurisdiction or a failure to preserve the issue for appeal; (2) considering the merits of the claim to determine whether error occurred below; and (3) assessing whether the error requires reversal, that is, whether the error can be deemed harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021).

At the second step, appellate courts consider whether the instruction was legally and factually appropriate, using an unlimited standard of review of the entire record. 313 Kan. at 254. In determining whether an instruction was factually appropriate, courts must determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction. 313 Kan. at 255. The requested instruction provides:

> "Each crime charged against the defendant is a separate and distinct offense. You must decide each charge separately on the evidence and law applicable to it, uninfluenced by your decision as to any other charge. The defendant may be convicted or acquitted on any or all of the offenses charged. Your finding as to each crime charged must be stated in a verdict form signed by the Presiding Juror." PIK Crim. 4th 68.060 (2016 Supp.).

22

The Notes on Use for this pattern instruction explain that it "should be given when multiple counts are charged." PIK Crim. 4th 68.060, Notes on Use. The parties agree that a multiple counts instruction based on PIK Crim. 4th 68.060 is both legally and factually appropriate because the State charged Reed with multiple counts of aggravated criminal sodomy in this case. See *State v. Macomber*, 244 Kan. 396, 405, 769 P.2d 621 (1989), *overruled on other grounds by State v. Rinck*, 260 Kan. 634, 923 P.2d 67 (1996). Thus, we are compelled to find the district court erred in failing to give the instruction.

The only dispute is thus whether that error requires reversal. Because Reed did not object below, we review the district court's failure to give a multiple counts instruction for clear error. K.S.A. 22-3414(3) ("No party may assign as error the giving or failure to give an instruction . . . unless the party objects thereto before the jury retires to consider its verdict . . . unless the instruction or the failure to give an instruction is clearly erroneous."). For the omission of a jury instruction to be clearly erroneous, we must be firmly convinced the jury would have reached a different verdict if the instruction had been given. The party claiming clear error has the burden to show both error and prejudice. See *State v. Mendez*, 319 Kan. 718, 727-28, 559 P.3d 792 (2024).

For his argument, Reed references *State v. Macomber*, 244 Kan. 396, 406, 769 P.2d 621 (1989), in which the Kansas Supreme Court held that giving a multiple counts instruction deviating from the recommended pattern instruction did not require reversal because the district court also gave separate verdict forms that prevented the jury from being misled. Although Reed does not mention it, Kansas appellate courts addressing this issue generally have reached the same conclusion as *Macomber*. See, e.g., *State v. Gould*, 271 Kan. 394, 402, 23 P.3d 801 (2001); *State v. Kelly*, 262 Kan. 755, 764, 942 P.2d 579 (1997); *State v. Mitchell*, 262 Kan. 687, 697, 942 P.2d 1 (1997). One exception is *State v. Wade*, 284 Kan. 527, 545, 161 P.3d 704 (2007), in which the Kansas Supreme Court held that "[t]he manner in which the State charged the crimes and the liberal use of

incorporation by reference in the various 'separate' instructions presented a case in which a multiple counts instruction was highly desirable, if not absolutely necessary."

Reed's argument does not contain any parallels to suggest that the district court's failure to give a multiple counts instruction misled the jury like in *Wade*. Instead, he admits there were separate verdict forms for each count of aggravated criminal sodomy and that the State clearly explained which count could be attributed to a specific act of sodomy—anal penetration versus oral contact—committed against H.R. While the verdict forms and elements instructions for each count were identical, the State correctly notes that Reed's argument is built entirely on speculation that does not equate to evidence of jury confusion about these separate acts supporting each count. In short, while the district court erred in failing to give a multiple counts instruction, we are not firmly convinced there is a real possibility the jury would have rendered a different verdict had that instruction been provided. The district court's failure to give the instruction was not clearly erroneous.

IV.     THE DISTRICT COURT DID NOT CLEARLY ERR BY FAILING TO PROVIDE
        DEFINITIONS RELATED TO PROMOTION OF OBSCENITY

Likewise, Reed argues the district court erred when it failed to provide definitions related to the charge for promoting obscenity to a minor. He contends that not providing the specific technical definitions for the terms "obscene," "material," "obscene device," "performance," and "prurient interest," allowed the jury to convict him based on the common definitions of those terms, and that providing the definitions would have resulted in an acquittal on that charge.

Again, the parties agree that an instruction providing the definitions would have been legally and factually appropriate. See *Holley*, 313 Kan. at 254-55. The State charged Reed with promoting obscenity to a minor under K.S.A. 21-6401(a), (b), which prohibits "recklessly . . . publishing [or] presenting . . . any obscene material or obscene device"

24

and "where a recipient of the obscene material or obscene device or a member of the audience of an obscene performance is a child under the age of 18 years." The statute defines the terms requested by Reed in K.S.A. 21-6401(f), and PIK Crim. 4th 64.030 (2023 Supp.) recommends the following definitions:

"Obscene:

"Any material or performance is 'obscene' if:

(a)     the average person applying contemporary community standards would find that the material or performance, taken as a whole, appeals to the prurient interest;

(b)     the average person applying contemporary community standards would find the material or performance has patently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated, including sexual intercourse or sodomy, or masturbation, excretory functions, sadomasochistic abuse, or lewd exhibition of the genitals; and

(c)     taken as a whole, a reasonable person would find the material or performance taken as a whole, lacks serious literary, educational, artistic, political, or scientific value.

"'Material' means any tangible thing, which is capable of being used or adapted to arouse interest, whether through the medium of reading, observation, sound, or other manner.

"'Obscene device' means a device, including a dildo or artificial vagina, designed or marketed to be used primarily for the stimulation of human genital organs, except such devices disseminated or promoted for the purpose of medical or psychological therapy.

"'Performance' means any play, motion picture, dance, or other exhibition performed before any audience.

25

"'Prurient interest' means an unhealthy, unwholesome, morbid, degrading, and shameful interest in sex."

Because the State charged Reed with promoting obscenity to a minor and the statute includes these terms, an instruction containing these definitions was both legally and factually appropriate. Accordingly, we find the district court erred in failing to provide the requested instruction.

The only dispute is whether the court's error requires reversal. Because Reed did not object below, he must firmly convince us the jury would have reached a different verdict if provided with an instruction containing these definitions. K.S.A. 22-3414(3); *Mendez*, 319 Kan. at 727-28.

Reed acknowledges that the State charged him based on H.R.'s allegations that he showed her pornographic pictures or videos on his phone of sexual acts involving adult men and children. He also acknowledges that the State introduced an exhibit of an officer's bodycam video scrolling through the open browser tabs on Reed's phone, which contained pornographic sites referencing images and videos of "young" girls. But for his clear error argument, Reed contends that providing the requested definitions would have resulted in a different outcome because (1) the State never proved that he showed any particular website displayed on the bodycam video to H.R.; (2) the jury might have concluded a mobile phone is not an "obscene 'device'"; and (3) the jury could not consider whether the contents of the websites on his phone met the "highly technical" definition of "obscenity."

Reed's arguments fall short of firmly convincing this court that the jury would have reached a different verdict if it had been provided with the requested definitions. To his first point, the State did not argue that the pornographic websites depicted on the officer's bodycam video were the exact pictures or videos that he allegedly showed H.R.

26

Instead, H.R. described being shown pictures or videos of adult men sexually abusing children, specifically by forced oral sex, and then performing those same acts on Reed at his request. More to the point, Reed fails to explain how the materials described by H.R.—young children performing oral sex on adult men—or the pornographic websites depicted on the bodycam video did not qualify as obscene even under the specific definitions requested. In sum, while the district court erred in failing to provide the requested definitions in an instruction, we are not firmly convinced there is a real possibility the jury would have rendered a different verdict had the definitions been provided. The district court's failure to give the requested instruction was not clearly erroneous.

V.     TO THE EXTENT THE PROSECUTOR'S CLOSING ARGUMENT WAS ERROR, IT WAS HARMLESS

For his penultimate argument, Reed argues two claims of prosecutorial error. First, he contends the prosecutor improperly presented inflammatory argument during closing argument by repeatedly referring to a breach of parental trust between Reed and H.R. Second, Reed contends the prosecutor improperly mentioned his decision to self-represent as a reason to impose consecutive hard 25 life sentences at sentencing.

Reed acknowledges these prosecutorial error claims are being raised for the first time on appeal because Toth did not object during the State's closing arguments or at sentencing. He also correctly notes—and the State does not contest—that appellate courts can review prosecutorial error claims, even if raised for the first time on appeal. See *State v. Barnes*, 320 Kan. 147, 163, 563 P.3d 1255 (2025) ("A contemporaneous objection is not required to preserve claims of prosecutorial error for appellate review."). However, "'the presence or absence of an objection may figure into our analysis of the alleged misconduct.'" *State v. Sean*, 306 Kan. 963, 974, 399 P.3d 168 (2017).

27

We use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman*[, 386 U.S. 18]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

A.    *The prosecutor's statements during closing argument about a breach of trust were improper, but ultimately harmless.*

Reed's first argument concerns several statements made by the prosecutor during closing arguments. Near the beginning, the prosecutor stated: "There is a special trust that is put into adults by children, particularly parents. They trust parents and adults to take care of them, to protect them, to show them right from wrong. That was not done in this case. This Defendant shattered that little girl's trust." Later, when arguing that H.R. lacked the capacity to consent because of her age, the prosecutor stated that "[H.R.] placed her trust in [Reed], and he did this to her."

According to Reed, these remarks improperly invited the jury to decide the case based on sympathy for the victim since none of the charged offenses required a breach of trust as an element. The law is clear that prosecutors should not make statements designed "to inflame the passions or prejudices of the jury or to divert the jury from its

28

duty to decide the case based on the evidence and the controlling law." *State v. Lowery*, 308 Kan. 1183, Syl. ¶ 5, 427 P.3d 865 (2018).

The State attempts to justify the prosecutor's remarks as bolstering H.R.'s credibility and explaining how long it took for H.R. to report the sexual abuse. But it ignores that the Kansas Supreme Court has found statements like the ones made by the prosecutor here to be improper. For example, in *State v. Martinez*, 290 Kan. 992, 1015, 236 P.3d 481 (2010), the Kansas Supreme Court held it was improper for the prosecutor to appeal to the jurors' parental instincts by urging them to convict the defendant to let the victim know "'she did the right thing'" by reporting the crime. In *State v. Tosh*, 278 Kan. 83, 92-93, 91 P.3d 1204 (2004), *overruled on other grounds by Sherman*, 305 Kan. 88, the Kansas Supreme Court found it was improper to state that the defendant "'failed to protect'" his child and tell the jury to convict in order to "'protect'" the victim. Although *Sherman* explicitly overruled the harmless error analysis used in *Tosh*, the Kansas Supreme Court nonetheless still cites *Tosh* favorably on the error prong. See *State v. Nesbitt*, 308 Kan. 45, 56-57, 417 P.3d 1058 (2018).

On the other hand, the Kansas Supreme Court has also rejected claims of prosecutorial error based on statements that the defendant took advantage of the victim or breached their trust. See *State v. Duong*, 292 Kan. 824, 833-34, 257 P.3d 309 (2011). In that case, however, the comments were found not to be error because they "were closely tied to the admitted evidence in this case[,] designed to address opportunity and motive . . . [and] illustrated, for example, how circumstantial evidence could be probative on the element of intent." 292 Kan. at 834.

The context of the prosecutor's statements here shows they are more like the comments found to be improper in *Tosh* and *Martinez* than those at issue in *Duong*. By telling the jury that Reed failed to "take care" of his child, "protect" her, or "show [her] right from wrong," the prosecutor implicitly conveyed to the jurors that they would

29

likewise be abandoning H.R. if they failed to convict Reed. The prosecutor also did not tie the statements to H.R.'s credibility as the State suggests in its brief. The prosecutor's statements were designed to inflame the passions of the jurors and divert their attention from the evidence. Thus, we find prosecutorial error.

Moving to the prejudice prong, we find that Reed is not entitled to reversal of his convictions based on the prosecutor's erroneous statements. The strength of the State's case made the evidence of his guilt overwhelming. Determining Reed's guilt was not entirely a question of H.R.'s credibility, although it was a significant factor. In short, various pieces of evidence, including forensic DNA analysis, medical records, and school records, corroborated H.R.'s account of the repeated sexual abuse she suffered because of Reed. The browser history on Reed's phone further corroborated H.R.'s allegations that he showed her obscene materials on his phone. Moreover, the lack of any objection to the prosecutor's statements confirms that Reed did not believe they would impact the jury's verdict. We find there is no reasonable possibility that the prosecutor's erroneous statements contributed to the jury's verdict.

B.      *The prosecutor's statements at sentencing were improper, but ultimately harmless.*

As Reed notes, claims of prosecutorial error are not confined to trial, as "[o]ne's fair trial right is equally protected in a penalty phase." *State v. Wilson*, 309 Kan. 67, 74, 431 P.3d 841 (2018). The same test applies when evaluating a claim of prosecutorial error arising in a nonjury setting. 309 Kan. at 77 (applying *Sherman*).

The Kansas Supreme Court has said that "it is improper for the prosecutor, by questions or comments, to draw incriminating inferences from a defendant's exercise of this right." *Sean*, 306 Kan. at 976 (citing *State v. Dixon*, 279 Kan. 563, 591, 112 P.3d 883 [2005]). *Sean* and *Dixon* similarly discussed comments and statements made about the

30

defendant retaining an attorney. In contrast, this case involves the prosecutor mentioning consequences of Reed's decision to represent himself at trial as a basis for imposing consecutive hard 25 life sentences:

> "And I will tell you, as the Court is aware, I think watching the Defendant cross-examine her, [H.R.], and re-victimize her was another reason [for consecutive sentences] and certainly, I am not asking the Court to penalize the Defendant for exercising his right to a trial because, obviously, he has that, and his right to represent himself. But what I am asking the Court to think about is the effect that this has had on [H.R.], all of it, and the fact that she is sentenced to a life sentence that will be longer than 25 years."

Reed does not discuss the issue much in his brief, but the *Dixon* and *Sean* holdings would nonetheless extend to comments about a defendant's decision to exercise his or her right to self-representation since it stems from the right to counsel. The State offers no contrary authority stating otherwise, instead asserting that the prosecutor directly asked the court "not" to penalize Reed for exercising his right to self-representation among its discussion of other permissible reasons to elevate Reed's sentence. The State's explanation naively ignores that H.R. being cross-examined by Reed and being re-victimized imply they are direct consequences of his decision to exercise his right to self-representation. In other words, these comments by the prosecutor created an improper negative inference that Reed should be penalized for exercising his constitutional rights. Accordingly, we find the prosecutor's statements were prosecutorial error.

That said, any impact of the State's error is harmless. As the State points out, the district court is presumed to know the law. *State v. Johnson*, 258 Kan. 61, 65, 899 P.2d 1050 (1995). Given that the prosecutor specifically advised the judge not to penalize Reed for exercising his constitutional rights, this court can presume the court did not do so when imposing the sentence in this case. In fact, the court's explanation of its ruling was focused on the facts of the case and the impact Reed's sexual abuse would have on H.R., which are both proper considerations. Nothing about the court's explanation gave

31

the indication that it relied on the inference created by the prosecutor's improper comments. In sum, we agree with the State and find there is no reasonable possibility that the prosecutor's erroneous statements at trial or sentencing violated Reed's right to a fair trial.

VI.    CUMULATIVE ERROR DID NOT DEPRIVE REED OF A FAIR TRIAL

Lastly, Reed argues the cumulative effect of the errors mentioned above deprived him of a fair trial.

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024). That said, the cumulative error rule does not apply if there are no errors or only a single error. *State v. Lowry*, 317 Kan. 89, 100, 524 P.3d 416 (2023).

Reed's first issue concerns a violation of the right to counsel, which if established would be structural error. *Johnson*, 310 Kan. at 913-14. But since the facts and circumstances of this case show Reed knowingly and intelligently waived his right to counsel, this claim does not contribute to a cumulative error analysis.

Two of Reed's claims of error relate to unpreserved jury instruction challenges. A jury instruction challenge raised for the first time on appeal will not contribute to a cumulative error analysis unless the appellant shows the giving or failing to give such instruction amounted to clear error. *State v. Waldschmidt*, 318 Kan. 633, 662, 546 P.3d 716 (2024). Because Reed does not meet that burden for the jury instruction challenges described above, this court also need not consider whether omitting a multiple counts instruction for the aggravated indecent liberties charges or an instruction defining certain

32

terms related to the charge for promoting obscenity to a minor accumulated with any other errors.

But three errors do contribute to a cumulative error determination. The district court erred by engaging in ex parte communications with the jury during deliberations, making that claim of error available for a cumulative error analysis. And we have also found that the prosecutor erred by making statements during closing arguments to inflame the passions of the jury and garner sympathy for H.R. Finally, we found prosecutorial error when the prosecutor referred to Reed's decision to exercise his right to self-representation and cross-examine the victim at sentencing.

Yet Reed fails to explain how any of these errors combined to deprive him of a fair trial. The district court's ex parte communication with the jury was separate and distinct from the prosecutorial errors at trial and sentencing. The district court's error stemmed from a question posed by the jury about receiving a transcript of H.R.'s trial testimony, to which the court explained they could receive a read-back or review the Sunflower House interview video since it was an exhibit. But the jury's question itself shows it focused on the evidence, particularly H.R.'s statements detailing the recurrent sexual abuse carried out by Reed, not the prosecutor's improper statements prior to deliberations regarding a breach of trust. And the brief reference at sentencing to Reed's decision to self-represent and cross-examine the victim, when presented to a judge who was all too aware of Reed's right to represent himself does not give rise to reversable error even when the errors are cumulated. Given the strength of the evidence and the harmless nature of each error, we are convinced beyond a reasonable doubt that the outcome would have been the same even if these errors had not occurred.

Affirmed.